Pee Cueiam
: This case was referred pursuant to former Eule 45(a), now 57(a), to Trial Commissioner Paul H. Mc-Murray with directions to make findings of fact and recommendation for a conclusion of law. The commissioner has done so in an opinion and report filed July 22, 1964. The plaintiff has excepted to the opinion and certain of the findings of fact. The parties have filed briefs and the case has been orally argued. Since the court agrees with the commissioner’s findings, his opinion, and his recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.
OPINION OF THE COMMISSIONER
The plaintiff sues for the retired pay of an officer retired for disability incurred in military service. The plaintiff *551 served as a Captain in the Corps of Engineers, U.S. Army Reserve, on active duty during World War I from August 15,1917, until his discharge on June 10,1919. Plaintiff remained in the Army as a member of the Officers Reserve Corps, and with the advent of World War II was directed to be examined physically for extended active duty. Plaintiff was found permanently disqualified for active duty by reason of arterial hypertension, moderate and cardiac hypertrophy, severe on December 31,1941; and on October 19,1942, he was again found permanently incapacitated for active duty by reason of hypertension, mild, persistent. On November 13, 1942, a Medical Appeal Board, after reviewing the applicant’s medical history and examining him, determined that there was no evidence of cardiac pathology and recommended his acceptance for general military duty. On December 16, 1942, plaintiff entered extended active duty as a Lieutenant Colonel and served in Europe as a commander of a combat engineer battalion and later a regiment.[1] On February 21, 1946, plaintiff was relieved from active duty (not by reason of physical, disability) in the grade of Colonel, on the basis ■of a final type physical examination given him on December .5,1945. It was determined, on the basis of the. examination, that plaintiff was not permanently incapacitated for general or limited service but there is no evidence in plaintiff’s military record that he was given an electrocardiogram at the time of his release from active duty.
• On July 15,1946, plaintiff applied for extended active duty in the grade of Colonel. On August 26,1946, he was ordered to report for active duty but in the rank of Lieutenant Colonel instead of the grade of Colonel, as he had requested. The orders were canceled upon plaintiff’s statement that he could not, for business reasons, afford to serve at a lower rank than -Colonel.
On February 10,1956, plaintiff applied to the Army Board for Correction of Military Records requesting that his records be corrected to show retirement for physical disability. In support of his application, plaintiff submitted photostatic *552 copies of bis physical examinations accomplished by two private physicians, dated December 19, 1955. He also produced letters from his former commanding officers regarding his participation in the European theatre of operations during World War II. On the basis of an examination of plaintiff’s medical records, made during his tour of extended active duty during World War II, the Office of the Surgeon General of the Army expressed the opinion that at the time plaintiff was released from active duty he was not suffering from any disabilities of such nature or degree as would warrant his retirement under the applicable rules, regulations, laws or policies then in effect. On June 26,1956, the Army Board for the Correction of Military Records concurred in the opinion expressed by the Office of the Surgeon General and plaintiff’s application for correction of his military records was denied.
On February 5,1957, plaintiff applied to the Army Board for Correction of Military Records for reconsideration of the original application of February 10,1956, to have his military records show entitlement to retirement by reason of physical disability. On May 21, 1957, plaintiff was informed that, after a review of all evidence submitted with his origina,! application, it had been determined by the Board that its prior denial of plaintiff’s application should be affirmed.
Plaintiff again applied to the Correction Board for reconsideration of his prior applications for correction of his military records to show retirement for physical disability, and on February 18, 1959, a hearing was held before the Board at which plaintiff was represented by counsel. Affidavits and other evidence were presented on plaintiff’s behalf and a transcript, comprising 46 pages, taken of statements made at the hearing. On the basis of the application for correction,, case summary, transcript of the hearing, the officer’s AG 201 File and Medical Records, the Correction Board concluded that, at the time of his release from active duty, plaintiff did not have any disability of such nature or degree as to warrant his retirement by reason of physical disability, and recommended denial of plaintiff’s application. On March 10,1959, the Assistant Secretary of the Army approved the recommendation of the Correction Board and denied plaintiff’s: application for retirement.
*553 On May 28, 1959, plaintiff filed Ms petition in this court alleging that the decision of the Army Board for the Correction of Military Records was arbitrary, capricious, and contrary to the record.
The first issue which must be considered is whether the petition is barred by the statute of limitations. 28 U.S.C. 2501 provides that “Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.”
In the present case, the date on which the claim accrued is either February 21,1946, the date plaintiff was relieved from active duty, or March 10,1959, the date on which the Assistant Secretary of the Army approved the recommendation of the Correction Board and denied plaintiff’s application for retirement.
In Friedman v. United States, 159 Ct. Cl. 1, 17, 310 F. 2d 381, 391 (1962), cert. denied, 373 U.S. 932 (1963), the court’s statement, in discussing the statute of limitations when there has been no application for Retiring Board proceedings and the issue is whether a claim accrued upon final action of the Correction Board, was as follows:
In Patterson v. United States, 141 Ct. Cl. 435, 438, the plaintiff was released without a Retiring Board in March 1946 and did not seek relief until he applied to the Correction Board in January 1953; suit was begun in 1958. The court held broadly that the rule was “that where a plaintiff has received no determination of Ms eligibility for disability retirement pay by any board until the correction- board has acted, his cause of action accrues not at the time of his separation from the service, but at the time of the alleged wrongful action of the correction board, approved by the Secretary, in wrongfully refusing to correct the records and grant the plaintiff disability retirement with pay.” There was no suggestion that Patterson had good justification for failing to apply to the Retiring Board.
Although they hold that limitations does not defeat the suit of an officer who first brings his claim for disability retirement to the Correction Board, the Proper and Patterson cases are not incompatible with the other decisions holding that the claim arises upon the final action of the Retiring Board. The rationale of all the cases, taken together, is that Congress has given the *554 function of deciding entitlement to disability retirement to tbe Secretary, acting with, or through a statutory board, and that the claim does.not accrue until final action on the basis of the determination of the first competent board to decide. As this court has said, “All of these boards, the Eetiring Board, the Disability Review Board, and the Board for Correction of Military Records act only in an advisory capacity to the Secretary of War. If his decision on the retirement rights of an officer is alleged to have been arbitrary, then the officer’s right to come to the court for redress accrues as soon as the arbitrary decision is rendered.” Girault v. United States, 133 Ct. Cl. 135, 144, quoted in Lipp, supra, 157 Ct. Cl. at 201, n. 2. Either the Retiring Board or the Correction Board is a proper 'board to perform this function of advising the Secretary;12 and where a Retiring Board has not been had or requested, the officer’s application to the Correction Board together with the action of that Board take the place of the Retiring Board’s function in triggering the statute of limitations. The Correction Board becomes the first proper board to act (or to be asked to act) on the matter, and the claim does not ripen until that Board’s action is final.
Since plaintiff’s cause of action in this casé is based upon the allegation that the action taken by the Secretary of the Army was arbitrary or capricious, contrary to law, or not supported by substantial evidence, it would logically follow that the claim did not accrue until the Secretary denied entitlement to retirement benefits. Defendant presents no authority for its position that the cause of action accrued on February 21, 1946, other than the citation of MacFarlane v. United States, 134 Ct. Cl. 755 (1956), which is distinguishable since plaintiff in that case appeared before an Army retiring board for consideration of his disability status prior to his release from active duty.
In the present case, an application of legal standards to the facts presents no bar based on the statute of limitations to the determination of the suit by this court. The first authorized board to which plaintiff made application was the Army Board for Correction of Military Records and the claim accrued on March 10, 1959, when the Assistant Secretary of the Army approved the recommendation of the Correction Board and denied plaintiff’s application to have *555 bis records corrected to allow retirement for physical disability.
The jurisdiction to determine an officer’s eligibility for retirement for physical disability is conferred on the Secretary of the Army, acting through boards set up by the Secretary to review the application, and, finally, by the Secretary himself. This court has no jurisdiction in the matter unless the Secretary’s action was arbitrary, capricious, unlawful, or not supported by substantial evidence. Nichols v. United States, 158 Ct. Cl. 412. In Hoen v. United States, 157 Ct. Cl. 235, 240 (1962), tMs court said:
This court has repeatedly made it clear that it will not review the decision of an authorized board of the Armed Services in a disability retirement case to determine when or whether a service man is fit or unfit for military service. The burden of proof is on plaintiff in all such cases to establish that the denial of retirement rights was arbitrary, capricious, or contrary to law. * * *
Thus, before a decision can be made as to whether the plaintiff was in fact physically disabled at the time of his release to inactive duty, there must be a determination that the Board did act arbitrarily, capriciously, or without foundation in fact. The evidence which the Board considered and the Secretary of the Army reviewed consisted of the application for correction of military records, a case summary by a Correction Board examiner, the transcript of the Correction Board hearing, the officer’s AG 201 file and the medical records. For reasons involving some facet of this evidence or the Board’s consideration of it must come a decision as to whether the Board’s decision was arbitrary, capricious, or unsupported by substantial evidence.
The application by plaintiff for the correction of his military records included copies of the two records made at the physical examinations of December 31,1941, and October 12, 1942, on the basis of which plaintiff was rejected for active duty, and the record of the physical examination of a Medical Appeal Board on October 27, 28, and 29,1942, at which time plaintiff was found physically qualified for general military , duty. No contention is made by plaintiff as to any unfairness or defects in these examinations, but he does assert, and rightfully, that these records should have alerted *556 the authorities at the later time when the final physical examination was given to plaintiff prior to his release from active duty to thoroughly examine his heart, including the taking of an electrocardiogram. This appears to be a major thesis upon which plaintiff’s case rests with respect to the Board’s decision being arbitrary, capricious, or unsupported by substantial evidence.
On first analysis, it appears that an error was made at the time of plaintiff’s final examination in failing to obtain an electrocardiographic report in plaintiff’s case. Obviously, this is a very important phase of a final type examination. The failure to obtain an electrocardiogram at the time of plaintiff’s final physical examination was a serious oversight in view of the complete medical history in the case, and does not appear to be proper medical practice, but that failure, alone, does not discredit the record made at the physical examination of December 1945. The medical findings of that examination are evidence to be considered by a Correction Board. A determination as to whether the Board’s action was arbitrary, capricious, or not supported by substantial evidence, requires a careful analysis of all the evidence which might tend to refute such action.
The evidence to be considered consists of three report letters from three doctors who have treated plaintiff since his release from active duty. The letters do not refer to plaintiff’s medical condition as of the date of his separation from active duty, nor can any implication be reasonably made from the letters to the effect that plaintiff was seriously disabled at the time of release from active duty on February 21, 1946. As evidence, those letters are not pertinent to the principal issues raised in this case, since they relate to periods subsequent to active service, except to reflect permanency of certain existing conditions.
At the hearing before the Correction Board, plaintiff was represented by counsel consisting of an attorney and a medical doctor. The import of their presentation to the-Board was that the type of military service performed overseas by plaintiff was rigorous, physically demanding, and accomplished under combat conditions. These circumstances would tend to support the conclusion that plaintiff’s present disabil *557 ity was service-incurred or aggravated. A critical review of the physical examinations given plaintiff and the resulting military medical records was presented by plaintiff. Consideration of the transcript of the hearing before the Board does not warrant a conclusion that the Board was arbitrary in its final decision with respect to Department of the Army records.
At the trial in this court before the trial commissioner, the only witness presented was Dr. Angelo May, an expert medical witness on behalf of plaintiff. Dr. May had examined plaintiff but once, on May 7, 1962, the day prior to the trial. Defendant objected to the testimony of Dr. May on the ground that it was immaterial and irrelevant to the issue as to whether or not the Board’s decision was arbitrary, or capricious, or not supported in law, citing Furlong v. United States, 153 Ct. Cl. 557, 566 (1961), where this court said:
Plaintiff introduced before our Trial Commissioner the testimony of certain doctors who gave their opinions of what plaintiff’s condition had been thirteen years before the date of their examination of him. When we weigh such testimony against the testimony of the Army doctors who gave their opinions of plaintiff’s condition based upon examinations just made, the scales are weighted heavily in favor of the latter testimony.
The admissibility of such testimony is doubtful, anyway ; but we suppose it is competent to show that the evidence before the board was so incredible that no one undertaking to arrive at a fair and impartial decision could have given it credence. * * *
The testimony of Dr. May was admitted but its weight and probative value are diminished by the principle stated in Furlong. The contention of plaintiff is that, based on plaintiff’s condition at the time he entered the service in 1942, the type of military service in which he was thereafter engaged necessarily aggravated his previously existing heart condition. If plaintiff has been successful in showing that his strenuous combat service aggravated a preexisting heart condition, it still remains necessary to establish that plaintiff’s disability was in fact aggravated during military service to the requisite degree before he is eligible for disability retirement. The contention is incompatible with the medical findings sup *558 ported by tbe physical examinations that determined plaintiff was fit for military duty on December 16,1942, and again in December 1945. if- plaintiff was physically fit when he began his active duty,- then a majes premise of his eententie»; •with respeet te aggravation; is nfissingr ffer plaintiff te establish this premise he weald have te dew he was net existence of a disabling eend-itien at that thner* Before the question of aggravation enters the picture, it must be established that there was a disability which preexisted entrance upon active duty. This plaintiff has not attempted to do, although the Army records show that on two occasions after being examined on December 31,1941, and October 19,1942, he was found to be permanently incapacitated for active service. Those conclusions were reversed on December 16, 1942, by a Medical Appeal Board which found him physically qualified for active military duty.
The Correction Board, in reaching its decision that plaintiff was not disabled at the time of his release from active duty, by implication determined the issue with respect to aggravation, if any, which plaintiff incurred from or as a result of his military service. Based on the evidence before it, the decision of the Correction Board cannot be said to have been arbitrary or not supported by substantial evidence.
A further contention by plaintiff that under AK.-40-1025, Sec. 63g(4), a presumption is created that any increase in plaintiff’s disability during active service resulting from a condition that existed prior to active service is to be considered service aggravated does not serve plaintiff’s case too well. A reading of the [Regulation discloses the following statement:
* * * Also, incapacitating defects due to certain diseases, such as * * * arteriosclerosis * * *, and other chronic and degenerative diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of *559 preexisting conditions, and not incident to or aggravated by service. * * *
In Ms testimony before the trial commissioner, Dr. May categorized the plaintiff’s condition at the time of Ms release from active service as atherosclerosis. In the Merck Manual, Tenth Edition, published by Merck Sharp & Dohme Research Laboratories, Rahway, New Jersey, 1961 (which the parties stipulated may be referred to in their briefs, at the pretrial conference of January 12, 1962), the definition of atherosclerosis, at page 207, is “A form of arteriosclerosis characterized by areas of internal thickening due to localized accumulations of lipids.”
The nature of plaintiff’s condition appears to remove him from the provisions of the quoted [Regulation of the Army which creates a presumption of service aggravation. The Regulation characterizes plaintiff’s condition as one that could arise as a natural consequence of preexisting conditions.
A further obstacle in determining that the Board’s decision based on the records of plaintiff’s military physical examinations was arbitrary is raised by the testimony of Dr. May, at page 40 of the transcript, which follows:
Q. Well, would the diagnostic techniques available with the state of the medical knowledge in 1946, Doctor, and considering that you have told us that the patient would not be aware of his condition unless the arteries were occluded up to 75 to 100%, how could this condition have been diagnosed in 1846 ?
A. [By Dr. May] Well, perhaps it couldn’t have.
Tliis testimony, concerning the practice of medicine in 1946, appears to undermine some of the criticism against the medical examinations given at that time. Since it establishes the difficulty of diagnosing plaintiff’s condition at that time, it also makes any conclusions, arrived at on the basis of a physical examination accomplished sixteen years after the critical date, MgMy speculative. Thus, the medical reports in question are still the most reliable evidence as to plaintiff’s condition at that time and the reliance attributed to them by the Correction Board cannot be considered arbitrary or capricious.
*560 The question of whether a particular decision of a Correction Board is arbitrary, or capricious, or unsupported in law is substantially a factual one. No two case histories of plaintiffs are identical. This court applies the same principles and theories to many different fact patterns. Thus, a comparison of the cases is illuminating but not too rewarding in attempting to decide a specific case. The one overriding principle which emerges from the cases is that the burden is on the plaintiff to clearly show that the decision of a Correction Board was arbitrary or capricious or unsupported by substantial evidence.
It is only when the decision of the board is clearly unsupported by substantial evidence or when there was a noncompliance with applicable laws and regulations that this court will interfere with the findings of the board. Towell v. United States, 150 Ct. Cl. 422 (1960). On the basis of the evidence before the Board in this case, there appears no adequate basis for overturning the Board’s findings.
Findings on Fact
1. Plaintiff was bom in 1888 and is a citizen of the United States, residing in California. He was appointed as a Captain in the Corps of Engineers, U.S. Army Keserve, on August 15, 1917. He served on active duty during World War I until his release on June 10, 1919.
2. On December 81, 1941, plaintiff was given a physical examination and was found permanently disqualified for active military duty by reason of arterial hypertension, moderate, and cardiac, hypertrophy, severe. On October 19, 1942, plaintiff was again found permanently incapacitated for active military duty by reason of hypertension, mild, persistent. The report notes X-ray evidence of severe widening of the base of the heart and left ventricle and moderately thickened arteries consistent with age 54.
A Medical Appeal Board of the Army found this officer to be physically qualified for extended active duty in World War II as a Lieutenant Colonel, OBC, on the basis of a physical examination conducted on October 29, 1942. The examination stated that the officer’s heart was “normal” and his blood pressure was 148/88. Electrocardiograms were *561 taken on October 19, 1942, and on October 24, 1942. The interpretation of the first one was:
In view of tibe absence of cardiac enlargement as determined by X-ray, and the normal functional capacity determined clinically, I do not believe that the minor changes present in the above electro-cardiogram are disqualifying.
The interpretation of the second one was:
The few changes occurring in lead 3 as isolated findings have no significance. Normal electrocardiogram.
3. On November 13, 1942, a Medical Appeal Board, after reviewing plaintiff’s medical history and examining him, determined that there was no evidence of cardiac pathology and recommended his acceptance for general military service.
4. On December 16,1942, at the age of 54, plaintiff entered extended active duty as a Lieutenant Colonel. Plaintiff was sent to Europe, where he served as a commander of a combat Engineer battalion and at a later period he commanded a regiment.
5. On October 14,1944,'plaintiff was admitted to the 365th Station Hospital in Paris. During this period of hospitalization, the medical history shows that (1) he had intermittent bleeding from the nose for not less than two days; and (2) he had high blood pressure and received various injections and blood transfusions. He was returned to duty on October 24,1944.
6. Plaintiff was awarded the Croix de Guerre for distinguishing himself during the period from September 24,1944, to March 20,1945, in restoring canals, and repairing bridges and locks ahead of schedule by working day and night through all types of weather.
7. Plaintiff was recommended for the Legion of Merit on May 25, 1945. He was cited for exceptionally meritorious conduct in the performance of outstanding services for the period March 23, 1945, to May 22, 1945, in constructing a bridge at Mainz, Germany, while under sniper fire from the east bank of the Rhine River; for directing the assembly of equipment and construction of highway and railroad bridges across the Rhine River; and for,completing such work ahead of schedule.
*562 8. Plaintiff served on active duty between December 16, 1942, and February 21, 1946, on which, latter date he was released from active duty, not for physical disability, having been found in a final type physical examination given December 5, 1945, not permanently incapacitated for general or limited service. In the report of such examination, it was stated that plaintiff’s heart was “normal,” and that his blood pressure was 142/80; X-ray of chest interpretation: “No significant abnormality.” At the time of this examination plaintiff was 57 years of age. The record does not indicate that plaintiff took any exception at that time to the report or findings of the examination.
9. On February 21, 1946, plaintiff was given a physical examination and was released from active duty, not by reason of physical disability, in the grade of Colonel. There is no evidence in plaintiff’s military record that he was given an electrocardiogram at the time of his release from active duty, nor are there any known X-ray films which were made at the time of final physical examination.
10. On July 15,1946, approximately five months after his release from active duty, plaintiff applied for extended active duty in the grade of Colonel, stating in his application that he was physically fit for general service. Plaintiff’s application was granted, and on August 26, 1946, he was ordered to report for active duty in the rank of Lieutenant Colonel, instead of the grade of Colonel as he had requested. Plaintiff’s orders to perform active duty were canceled, however, upon his statement that he could not, for business reasons, afford to serve at a lower rank than Colonel. Plaintiff did not perform extended active duty after February 21, 1946.
11. Pursuant to Title III of Public Law 810 of the 80th Congress, plaintiff was retired as of June 29, 1948, in the grade of Colonel, A.U.S., receiving thereafter from his retirement such benefits by reason of age and years of satisfactory military service as are provided in the above-mentioned Act.
12. Statements submitted on behalf of plaintiff from three doctors (who did not testify) are summarized as follows:
(1) On June 18, 1948, Dr. Clement A. Sones, stated he first examined plaintiff; the diagnosis was arthritis, non- *563 functioning gall bladder, prostatitis and hypertensive heart disease. On June 4, 1954, Dr. Sones again examined plaintiff; the diagnosis was hypertensive heart disease in which the disability was complete.
(2) On December 19, 1955, Dr. Pierce A. Rooney stated that plaintiff had been under his cars for one year; that plaintiff was suffering from hypertensive heart disease and rheumatoid arthritis; that at times plaintiff was in congestive heart failure; that plaintiff was totally disabled as far as gainful employment was concerned, although he was ambulatory part of the time.
(3) On August 31, 1956, Dr. William B. Chase stated that the main cause of plaintiff’s disability was an advanced malignant type of hypertension. Dr. Chase expressed the opinion that plaintiff was totally disabled as far as active work was concerned.
These examinations were accomplished from three to ten years after plaintiff’s final type examination in 1945.
13. The following paragraphs with respect to the Veterans Administration Medical Records have been taken from data furnished the Army Board for Correction of Military Records at the hearing conducted February 18, 1959:
Final summary undated VA Hosp, Des Moines, Iowa, reflects appl was admitted 25 Mar 51 giving a history of having had difficulty in swallowing for the previous 10 or 15 years. On the day before, he had while eating suddenly noticed a choking sensation and had been unable to eat or swallow anything since then. On all previous occasions the symptoms had been relieved by assuming a head down position but such maneuver did not aid him on this occasion.
The physical exam showed appl’s weight as 210 lbs, blood pressure as 200/134 and enlarged heart to the left. The rest of the exam revealed no abnormalities.
X-ray of the heart and lungs revealed the heart to be moderately increased in diameter, principally to the left. X-ray of the esophagus revealed a paraesophageal hiatus hernia of the gastric fundus.
Hospital course: A few hours after admission on 25 Mar 51, the appl suddenly noticed that he could swallow again and had no further difficulty. He was advised as to the findings but stated that he did not desire any corrective therapy, as his symptoms occurred so infrequently and were of such a minimal nature. He was *564 discharged on 25 Mar 51 with the final diagnoses shown as (1) para-esophageal hiatal hernia of the gastric fundus (part of stomach but not esophagus ruptures into thorax) and (2) hypertension, arterial.
Final summary, YA Hosp, Des Moines, Iowa shows appl admittance as 11 Feb 53 with the chief complaints of hypertension of 20 years duration. At 0230 on 9 Feb 53 he had suffered a severe nasal hemorrhage. The appl said he had been a known hypertensive since about 1929 but with no known symptoms until 6 weeks prior to admission when he began to note ankle edema. In 1941, appl while in the Army, noted the onset of aching in the knees, ankles, hips and occasionally in his hands, but primarily in both knees. He took aspirin without relief. This distress continued through the years but he was able to get around. The symptoms were markedly aggravated by weather change.
Physical exam shows blood pressure as 200/120 right and left. Examination of the fundi revealed increased light reflex but no hemorrhages or AY nicking. The heart was enlarged to the left to percussion. There was bilateral edema of the ankles; stasis dermatitis about both ankles with venous prominence. Both knees were enlarged without swelling or evidence of fluid or tenderness. The right wrist and elbow were warm and swollen. The knuckles of the right hand were swollen with little or no ulnar deviation of the fingers. ECGr was abnormal on the basis of a right bundle branch block.
X-ray of the chest showed generalized cardiac enlargement with generalized pulmonary vascular congestion. X-rays of both knees, right wrist and right elbow showed narrowing of joint spaces and presence of .arthritis.
He was placed on a reducing diet and lost 23 y2 lbs. His urinary tract infection : cleared up and there was marked improvement of the arthritic complaints. His blood pressure was stabilized at 148/100 during hospitalization with a fall. to 120/84 during a sodium amytal test. He was discharged on 25 Feb 53 with the following recommendations: (1) Digoxin 0.5 mgms daily (2) 1800 calorie cardiac diet and (3) return to care of family doctor.
The final diagnoses were those of:
(1) Disease of Heart, improved
Cause: hypertension
Lesion: left ventricular hypertrophy
*565 Manifestations: cardiac failure and ECG abnormalities
Capacity for Work: class III, therapeutic Class C.
2) Cystitis, acute hemolytic streptococcus, improved
3) Arthritis, multiple joints, improved
4) Obesity, improved
14. On February 18, 1959, at 9:00 A.M., plaintiff's counsel appeared before an Army Board for Correction of Military Records to correct plaintiff's record to show that at the time of plaintiff's release from active duty in 1946 he was physically disabled to perform the duties of his office and that his disability was an incident of his service. A. careful explanation of plaintiff's medical records was made by his advocate, 0. S. Stephenson, M.D. Dr. Stephenson's analysis of plaintiff's disability covers about 40 pages of the transcript of record. In addition, about 50 pages of plaintiff's medical records were in evidence for the Board's consideration. The Board concluded the presentation of plaintiff's case about 4:30 P.M., and rendered a decision adverse to plaintiff.
15. AR 40-1025, Sec. 63g (4), states that:
Any increase in disability during active service resulting from a condition that existed prior to active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the bases of well-established medical principles. Medical or surgical treatment furnished during service for preexisting conditions does not of itself establish increase in disability; however, if such treatment was necessitated by increase in severity of preexisting conditions, then such disability will be considered as service-aggravated, unless the condition was improved by such treatment. Discovered healed residuals of a former injury or disease, without evidence of active pathology during service, will not be regarded morease in disability. Similarly, mere recurrences of certain diseases within a short period after the patient's entrance into active service, such as epileptic seizures, seasonal asthma, recurrent dislocations, etc., do not establish increase in the degree of disability. Also, incapacitating defects due to certain diseases, such as neoplasms, most endocrine disturbances (except hyperthyroidism or diabetes mellitus), epilepsy, arteriosclerosis, and hypertrophio (degenerative) arthritis, commonly designated as osteoarthritis, and other chronic and degenera- *566 tive diseases in which the onset is insidious and progress is slow, are of themselves not evidence of increased disability. Unless there was some pertinent local injury, or an abrupt and sudden pathological development during active service, such incapacitating defects may arise as a natural consequence of preexisting conditions, and not incident to or aggravated by service. On the other hand, advancement of such conditions as peptic ulcer, rheumatoid arthritis, diabetes mellitus, active pulmonary tuberculosis, and bronchial asthma (not established as seasonal) can be expected to have been caused by exertion, exposure, or other adverse influence of the military service. Acute infections such as pneumonia, active rheumatic fever (even though recurrent), acute pleurisy, acute ear disease, and sudden developments, as hemo-ptysis, lung collapse, perforating ulcer, decompensating heart disease, coronary occlusion or thrombosis, cerebral hemorrhage, occurring while in service, will be regarded as service-incurred or service-aggravated, unless it can be clearly and unmistakably shown that there was no increase in severity during active service.
16. In response to a request from the Army Board for Correction of Military Records, the Veterans Administration sent the following statement to the Board:
In compliance with your request of April 22, 1957, enclosed herewith you will find Army medical records and medical cards consisting of 28 pages.
A review of our records discloses that this veteran filed a claim for service connected disability compensation which was received at this office August 18, 1956. The veteran’s claim was rated December 20, 1956. A decision has been made that the veteran’s hypertensive heart disease; arthritis, hypertrophic, both knees and ankles and rheumatoid arthritis, right wrist, were not incurred in or aggravated by service. This veteran’s claim was therefore disallowed. He is not receiving any compensation from the Veterans Administration.
17. On May 8,1962, at the trial before the Commissioner, Dr. Angelo M. May, who is a specialist in cardiac and coronary surgery, testified as follows:
Mr. Finger : Q. Now, Doctor May, from the history that you obtained from the patient, and from the Army files, can you describe his condition, based upon that history at the time of his entry into the military service?
A. Yes. Prior to Colonel Kingsley’s entry into the *567 military service lie was turned down by a competent doctor on a physical examination as unfit by reason of arteriosclerosis complicated by congestive heart disease as unfit for military service. This would indicate to me that this man had sufficient atherosclerosis of his coronary arteries not only to be obvious to the physicians at, that time, with the limited means of their, at that time, being able to diagnose this condition, but also added to the severe extent that he became decompensated,
3: $ $ $ $
So that these physicians making that examination had only at their disposal electrocardiograms which, at that time, were not as accurate as the ones we make now. But in spite of all these inadequacies they were able, by physical examination, to determine that this man had an enlarged heart, and an enlarged left ventricle cardiac failure, and a decompensated heart.
Now, this means that at this time he had coronary occlusion to the degree that the muscle of the left ventricle could not carry on its maximum usage and was embarrassed to the extent that it had dilated in order to be able to pump blood out of its chamber.
This man was eager to enter the military service, and I don’t know what he did to get his heart compensated, but apparently he rested, followed medical direction, and was able, after a period of weeks, to restore competency of his left ventricle to the extent where he underwent another examination, at which time his blood pressure— the X-ray of his heart was sufficient to allow him to gain admission to the service of the United States.
This did not mean that there was any improvement or change in the presence of these atheromas in the coronary arteries. These do not improve, at least under any method that we have available at the present time, except for surgical removal.
No atheroma subsists, it simply grows larger. So these atheromas present in his coronary arteries were still present. However, he was able, by rest and other measures, to allow the muscle of his ventricle to contract. So that the fact that a competent physical was made at the time of his entrance, as opposed to an obvious decompen-sation of his heart prior, doesn’t mean that there was any improvement of the atheromas in his vessel.
And I would like to make that crystal clear, that the basic pathology of the formation of atheromas in his vessels was unchanged by the improvement in the physical.
*568 I don’t think we have to criticize any physical that was done by our Army doctors.
í[í íj* ijC
Q. Now, Doctor May, assuming a man with the heart background of Colonel Kingsley prior to his entry into the military service, and assume that after this man was called to active duty he spent a substantial portion of his ■time overseas, 4% months or upwards under actual combat conditions, in command of an Engineer Corps, spending a great deal of his time in cold weather, subjecting himself to combat conditions, constructing bridges under fire, and the man would get right out and work with his subordinates; assume that the mod that he ate would be Army K rations, or whatever food might be available to him; assume the many stresses that existed in our combat conditions of World War II:
Can you tell us. Doctor, what effect, if any, would you expect those conditions to have upon a man with the heart conditions that Colonel Kingsley had at the time of his entry into active duty ?
A. Yes, sir. I consider that a perfect background for an exacerbation of atherosclerosis of the coronary arteries and all the other arteries of the body as well.
Q. Well, Doctor, would the exacerbating or aggravating effect of those conditions necessarily be brought home to the man himself, that is, would he necessarily feel them at the time of his discharge from the service?
A. No, sir.
í Í* ^
So that when a person has developed heart failure we must assume that at least 75 or 80% of his coronary diameter has become occluded.
Q. Up until that time the man himself will not experience the symptoms ?
A. None.
^ , í*
. Q. Now, Dr. May, you have gone over this man’s military medical file, have you not ?
A. Yes.
• ' Q. And from your examination of the file, can you tell us what, if any, examinations were made of this man’s heart condition during his period of active service ?
A. None.
Q. Can you tell us what examinations were made at the time of his discharge ?
A. I ‘believe a brief cursory auscultation of his heart.
Q. Was he given an electrocardiogram?
A. I did not find a record of such.
*569 Q,. Can you tell us wbat the practice of the Army was, the general practice of the Army was, at the time of discharge of persons with known heart conditions, having served in the Army yourself ?
A. Persons with known heart conditions, I believe, according to a circular letter, at that time were supposed to have a thorough workup, including electrocardiogram, X-rays of the chest, AP and lateral, and blood findings that would go with determination of active heart disease, such as a sedimentation rate.
So that, as I remember, if I remember correctly, these were a minimum requirement. And I think they were also supposed to have been examined by someone who had adequate training in cardiac disease.
Now, it is true that at that time I happened — at the time of the end of the war I happened to be chief of a surgical service at Camp Fannin where we had a separation center that separated two million men, and I recall very vividly those days and how quickly we were trying to separate — everybody was anxious to get out. We had people in such huge quantities to try to process that by virtue of the fact of limitation of time and personnel we were unable to fulfill all of the requirements of the circular letter regarding each person who was discharged.
Q. Now, Doctor, from your examination of this man’s medical file, would you say that, in your opinion, whatever examinations or tests were performed on him during his military service, up to and including the time of his discharge, would they reveal the type of aggravation or exacerbation I have been discussing here this morning?
A. No sir.
18. On cross-examination, Dr. May stated, in answer to certain questions from counsel for defendant' and the Commissioner,-as follows:
Mrs. Goldberg : Q. Would you normally be willing to give a diagnosis as to what a patient’s condition was 16 years ago based upon your examination today ?
A. If that included records such as I had available, I would say yes.
The Commissioner: You mean by that, that in connection with your current examination you had reviewed his medical record ?
. The Witness: Yes.
The Commissioner: For what period iii the past? *570 Back to Ms military sendee, or since the military service ?
The WitNess : No, no. Back to such as we had available here in this particular case.
The Commissionee : I see.
Mrs. Goldberg: Q. Well, these records that were available, as I understand it, included many records that were made after 1946. Did you base your testimony strictly on the medical records up to 1946 ?
A. I based my opinion on every bit of evidence that was avalaible to me.
Q. In other words, you were influenced, then, by the medical records that were made after 1946. Is that correct ?
A. I would say I took them into consideration.
Q. Doctor, do you feel that the medical records in this case were complete enough for you to make a diagnosis as to what this man’s condition was in 1946 ?
A. Yes.
Q. You have no question, then, as to the caliber of these medical records? In other words, they are not deficient in any way ?
A. Well, I have no question as to the caliber of this patient’s coronary arteries prior to his entering into the-•
Q. No, Doctor. I am asking you about the caliber of the medical records, and particularly the medical records from 1941 to 1946.
Now I take it you have examined all of these records. It that true?
A. Yes, I have.
I imagine what you want to know is if I consider those medical records adequate.
Q. Yes. I want to know if you question whether or not an adequate examination was given by the military service.
A. Having been a member of the military service at that time, and having had the responsibility of supervising. the medical officers, I would say that they did a good job at that time, and I have no reason to question the veracity of the officers who made those examinations.
Q. Doctor, did you ever serve on a retiring board when you were in the military service?
A. Yes. We call it a CCD Board, and I was the chairman,
Q. What was a CCD Board?
A. That was the discharge-for-physical-disability board.
*571 % # ijc # #
Q. Then you wouldn’t be able to say bow much dilation of the ventricle there was unless you had the X-ray of the heart would you ?
A. That is correct, except--
Q. Did you find an X-ray of the heart in this record?
A. Yes, he had — let me retract that a minute, please. I have to retract that.
By physical examination we are also able at times to ascertain the presence of a dilated ventricle by percussion and auscultation of the heart; and physical examinations at that time, as well as X-rays, showed this man to have a dilated ventricle.
The other factors in this examination that showed the presence of coronary disease was an elevated blood pressure, and the fact that the man now had a blood pressure of 110/70 would seem to indicate that this was a temporary rise of blood pressure that was necessary because of his coronary atherosclerosis and in response to Starling’s law.
Q. Now, when you say he now had a blood pressure of whatever figure you gave, are you speaking of yesterday ?
A. Yes. And _ of course at his examination when he entered the service his blood pressure was normal too, but had previously been recorded as high.
Now, this is very good evidence that this mechanism was in effect at that time. And I have no reason to doubt the accuracy of those physicians. I would like to repeat that.
The CommissioneR: Would you be able to give us your opinion briefly as to why his blood pressure is normal now instead of what it was some time ago ?
The Witness : Yes. There are many reasons.
First of all, at this time he has developed collaterals in his heart so that it doesn’t need any greater blood pressure than is present to nourish the heart at the sustained activity level which is present now. And of course this level is far less than the level of physical exertion which was required at the time of his entrance in the Army.
The Commissioner: He is substantially a bed patient patient now, is that the case ?
The Witness: Yes.
Mrs. Goldberg : Q. Doctor, I believe in your testimony you mentioned that you were basing your testimony on the history obtained from the patient.
*572 A, No, no. I am sorry, I can’t say that. The patient at this time is so damaged by cerebral arteriosclerosis that any history given by him cannot be relied upon. He is not able at this time to — because of his advanced and severe atherosclerosis — to give a reliable history.
Q. Would you say, then, Doctor, that his testimony at this time as to his physical condition would be worthless?
A. Yes.
Q. Doctor, is hypertension, arterial, moderate, the same as the condition of the coronary artery about which you have been testifying ?
The WITNESS: Would you read that?
(Last question read.)
Mrs. Goldberg : Q. The atheromas in the arteries.
A. I will have to answer that no, and qualify it. The blood pressure is simply a measurement of the pressure in the arteries that may be varied by a great variety of conditions so that there is no direct synonymity between the two conditions.
The CommissionbR : Well, isn’t it correct, Doctor, that hypertension just means high blood pressure?
The Witness : At any particular moment ?
The Commissioner : Yes, at a particular time, when it is checked, and it doesn’t relate at all to these atheroma conditions you have been discussing ?
The Witness : No, we find the conditions in low pressure — as a matter of fact, he was ridden with atheroma at the time — 110/70—so the old idea that hypertension and atheroma went together was erroneous.
It is, however, more severe in certain individuals with hypertension than it is with people with low blood pressure. A person with low blood pressure is less likely to develop atherosclerosis than a person with high blood pressure.
However, there is such a wide variety of range of the effect of blood pressure on the vessels themselves that one must not lump to any conclusions between the recording of blood pressure and the presence of atheromatosis.
Mrs. Goldberg: Q. Well, Doctor, is there anything in the records of plaintiff about atheromatosis?
The only reference I find is to hypertension, arterial, moderate.
A. Yes. Well, unfortunately, until just a few years ago people had a completely erroneous idea of atherosclerosis and not many people thought of atheromas, and I had some small part to supply myself in the changeover *573 from this concept, and this occurred when we did this experimental work on the arteries in about 1954, 1955, and 1956.
When I started in with my experimental work I was under the same delusion as everybody else, that a heart attack was caused by a clot in a coronary artery, and my first instruments were designed to remove a clot of blood, and I was the most embarrassed person in the world when I began working upon these arteries to find that my instrument wouldn’t remove the atheromas.
When we sectioned these and found their true nature, these atheromas were heavy solids almost. They feel like polyethylene plastic or polyvarian plastic instead of soft clots of blood.
So that I had something to do with tins change of thought.
So these heart attacks are not just due to the clotting of blood in the vessel. These are due to the atheromas, the narrowing of the vessels.
❖ * * at %
The Commissioner : Excuse me. Is it correct to say that an atheroma is attached to the inside of the vessel as contrasted with what we used to call or referred to as a thrombus which was floating around and hit a place where it couldn’t go through a very small blood vessel and caused a thrombosis ?
The Witness: That is correct. We used to think that heart attacks were due to the coronary thrombosis, and people still talk about it. It will take them 50 years to change their concept.
:]i ij: ij: sfc
Q. Have you any idea how plaintiff’s heart, became compensated again by October 1942 when it had been decompensated previous to that time?
A. I think the man rested, possibly took some medications, and kept his activities low, and possibly avoided any condiments or other features of one’s diet that would tend to cause or maintain the decompensation.
Q. Is there anything in plaintiff’s records, medical records in this case, that so'indicate ?
A. No, there isn’t.
Q,. Did you say that there was an X-ray of plaintiff’s enlarged ventricle in the medical files in this case?
A. I don’t recall if I did, but I believe there was.
Mrs.- Goldberg: May we go off the record júst a moment?
(Off-the-record discussion.)
The Witness : Here we are, X-ray of the chest.
*574 Mrs. Goldberg : The doctor is referring to — What is that page?
The WitNess: Five. February’421 guess.
$ $ $ ‡ *s*
Mrs. Goldbeeg : Page 63 of Plaintiff’s Exhibit 1.
The Witness: And this X-ray of the chest shows severe widening, base of the heart and left ventricle, hypertensive heart disease with left ventricular hypertrophy.
The Commissioner: That answers the question, the hypertrophy, the enlargement of the left ventricle.
The Witness: Yes.
Mrs. Goldberg : Q,. It is upon the basis of this document that you state that plaintiff had atheromas at this time?
A. Yes, ma’am.
Q. When did this terminology, “atheromas,” become current, if it is current, in the medical profession?
A. I would say this was in the last four or five years. I had a heck of a time convincing them that the situation was due to atheromatosis rather than coronary thrombosis.
$ $ $ ‡ *
Q. Are those the only two things, other than ather-omas—
A. No, hut they are the most common things.
Now, there are a wide variety of strange and unusual conditions that can cause heart conditions, beriberi, and so on, all of which there is no evidence of in the record, or in the man’s subsequent recorded histories.
Q. Doctor, if this man had atheromas in 1942, would you still say that he would not be aware of the symptoms in 1946 after being exposed to the stress of battle and poor food?
A. That is perfectly possible; that is perfectly possible. We see some people with badly atheromatous hearts who have no trouble until suddenly one hemorrhage takes Elace in one of these atheromas, and then they get their eart’ attacks, or they get a .cerebrovascular accident which is due to a similar episode in one of those cerebral vessels.
Q. Would such a person, in your opinion, be incapacitated for limited service in the military, with this condition?
A. Yes. If I had anything to do with his original admission to the Army, I would have certainly not qualified him for general military service.
*575 However, those people who were in charge of this situation apparently saw fit, under the exigencies, of the necessity for this man to serve in a capacity which was very necessary at that time, and saw fit to qualify him for military service. And perhaps had I been aware of that necessity, I might have leaned over backwards too.
Don’t forget, at that time we were not aware of the importance of atherosclerosis nor of this narrowing percentage, percentage of the narrowing of the coronary vessels before heart failure would take place.
The COMMISSIONER: Well, there was also involved, Doctor, at least two examining boards, or medical boards, prior to his entrance upon this extended period of active duty, who held that he was incapacitated physically for general service; and then a so-called appeal board, a later board, found that there was nothing wrong with him and put him in. So you have a difference of medical opinion there before he went into the service, as to whether or not he was really disabled to such an extent that he shouldn’t have been put in general service.
The Witness : I would rather think, sir, that his first two examinations and his third examination, all were accurate; that the man had been decompensated.
The Commissioner: Yes. Well, you have explained the reason for the feeling that he was decompensated through rest, and this ana that and the other; you have explained that to me.
The Witness: Yes.
Mrs. Goldberg : Q. Well, do you question the findings that were made by the medical appeals board ?
A. No, I don’t question any findings here. I only question their interpretation.
In other words, despite the fact that he showed normal examination and X-ray at the time of his medical appeals board, this man had severe atherosclerosis before.
Q,. Now, are you basing that diagnosis purely on the enlarged ventricle ?
A. Yes, and his blood pressure.
Q. Well, didn’t you tell us that the blood pressure was really unrelated to the atheromas ?
A. I didn’t tell you it was unrelated to the atheromas; I explained that one did not draw any over-all identity between the two; but I merely indicated that the fact that this man. had a dilated .left ventricle which had to pump blood at a higher pressure was indicative that the arteries of the heart were narrowed, which needed, at least at this period, a higher blood pressure to force the blood through them, and this was the reason for the conclusion. This is a common thing, and when one has atherosclerosis *576 of the coronaries one does need higher blood pressure until collateralization happens.
When one has heart failure, one does have higher blood pressure when there is ventricular dilatation because of coronary artery insufficiency.
Q. But, Doctor, there are other things that would cause a high blood pressure, other than these atheromas. Isn’t that correct?
A. Oh, there are many other things that would cause a high blood pressure.
Q. In other words, the high blood pressure itself would not indicate an atheroma, necessarily %
A. No, not necessarily.
Q. Well, would the diagnostic techniques available with the state of the medical knowledge in 1946, Doctor, and considering that you have told us that the patient would not be aware of his condition unless the arteries were occluded up to 75 to 100%, how could this condition have been diagnosed in 1946 ?
A. Well, perhaps it couldn’t have.
❖ * * * *
19. Plaintiff was found physically fit for general military service at both the inception and at the termination of his tour of active duty in World War II by qualified medical examiners. Five months following termination of his active service, plaintiff applied for reappointment, indicating on Iris application that he was physically fit to perform general military duty. A finding by private doctors several years subsequent to plaintiff’s release from active duty that he was suffering from a disabling condition is not deemed to be a proper basis on which to reverse the finding of the Correction Board and the Secretary of the Army, when viewed in the light of the complete record.
20. On the basis of the complete record, including the record which was before the Correction Board, it is found that the action of the Board and the Secretary of the Army in denying plaintiff’s claim for retirement was not arbitrary or capricious and is supported by substantial evidence. It is not established by the record that plaintiff was incapacitated for active service at the time of his release from active duty in 1946 .by reason of any service-incurred condition or the aggravation of a pre-existing condition.
*577 Conclusion op Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and his petition is therefore dismissed.

 This is the case of a loyal and devoted Amy officer who served his country -with great distinction in World War II. He is now 76 years old and his condition has deteriorated to such an extent that on the basis of medical advice and •agreement of counsel for the parties, he was not called as a witness.

 Deleted by Order of Court dated October 1,1965.