**F. H. McGRAW & CO. v. UNITED STATES.**
**No. 47291.**

United States Court of Claims.
Feb. 7, 1949.

Mr. Joseph Lotterman, of New York City (Lotterman & Tepper, of New York City, on the brief), for plaintiff.

Grover C. Sherrod, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

WHITAKER, Judge.

1. On August 3, 1944, plaintiff entered into a contract with the defendant to erect an outside overhead pipe line for the conveyance of steam and air to various build-

ings on the Badger Ordnance project at Baraboo, Wisconsin. Some of the pipe was 20 inches in diameter, some 18 inches, some 16 inches, and some 10 inches. The 18-inch and 20-inch pipe were to be supported by concrete piers sunk into the ground, and the 16-inch and 10-inch pipe were to be supported by single, double, or four-pole structures.

The defendant or its agents were to furnish the drawings for the several piers and poles and were to determine their location from time to time as the work progressed. They were also to furnish the materials necessary for their erection.

The contract called for completion of the work by December 1, 1944. Plaintiff claims the defendant and its agents failed to furnish it with drawings for the poles and piers and failed to designate their location in time for it to complete its work by the contract completion date, December 1, 1944, and that as a result it was compelled to erect some of these piers and poles in frozen ground, which increased its costs, for which it sues.

Plaintiff worked under the supervision of the Mason and Hanger Company, who had previously entered into what is called an Architect-Engineer-Construction Management contract with the defendant. This company is referred to in the record as the A-E-M. The contract made it the authorized representative of the contracting officer and required plaintiff to work under its direction. It was its obligation as defendant's agent to furnish plaintiff with the necessary drawings for the piers and poles and to designate the places at which they were to be placed. There is no doubt that this company failed to furnish plaintiff with the necessary drawings in time for it to complete its work by December 1, 1944, and there is no doubt that this increased plaintiff's costs.

The contract called for the erection of 3,854 poles. By November 29, 1944, the plaintiff had been furnished with drawings for only 1,891 piers and poles, and all of these had been erected. On November 29, 1944, it was furnished with the drawings for 187 additional poles and piers. By December 1, 1944, all but 34 of these had been

erected. The balance of 1,810 had to be erected after December 1, 1944, because of defendant's failure to furnish plaintiff with the necessary drawings.

■ Since December 1, 1944 had been set as the completion date, it was undoubtedly the duty of defendant or its agents to furnish the necessary drawings in time for plaintiff to complete its contract by that date. George A. Fuller Company v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70, 94, et seq. And, if plaintiff's costs were increased by defendant's failure to do so, plaintiff is entitled to recover the excess, unless additional facts excuse such failure.

But defendant says that the original contract was modified by several supplemental contracts which extended the completion date to September 1, 1945, and that this correspondingly extended the time defendant was obligated to furnish the drawings. The Government relies on provisions in the several supplemental contracts, of which articles 2 and 3 of the first supplemental contract are typical. These articles read:

"Article 2. The time for completion of the work provided for in the contract as modified by this Modification No. 1 shall be and is hereby extended to 1 February 1945.

"Article 3. It is mutually understood and agreed that all other terms, conditions and provisions of the contract shall be and remain the same."

These supplemental contracts covered additional work such as the installation of outside process piping and inside process piping. They, together with certain change orders, increased the total amount of the contract price from $466,975.30 to $1,170,857.09. The extensions of time were granted because of the additional work to be done.

■ Although the terms of the supplemental contracts are susceptible of the construction that plaintiff was thereby granted additional time for the installation of the piers and poles covered by the original contract, we are satisfied from a reading of the testimony that this was not the intention of the parties. Both plaintiff's district manager in charge of this project and its

job engineer testified that it was not possible for them to defer the installation of the additional piers and poles until the frost was out of the ground, because the A-E-M demanded that this work be completed at the earliest possible minute, "regardless of weather conditions." The defendant does not dispute this testimony.

One of two things is true: If the parties intended to extend the time for the completion of the work covered by the original contract to September 1, 1945, then the defendant breached the modified contract by requiring plaintiff to work under adverse conditions in order to complete this work before the time fixed for its completion, as extended. If the parties did not intend to extend the time for the completion of the work under the original contract, then defendant is liable for having failed to furnish drawings in time for plaintiff to complete it by the original completion date, December 1, 1944.

▇▇▇ Defendant cannot escape its responsibility for having failed to furnish the drawings on time by extending the time for completion of the work, at least in a case where defendant insisted upon completion ahead of the extended date. Henry Ericsson v. United States, 62 F.Supp. 312, 104 Ct.Cl. 397, 428. Plaintiff based its bid on doing the work prior to December 1, 1944. Since defendant prevented it from completing the job by that time and it cost plaintiff more to do it thereafter, plaintiff in equity and good conscience and in law is entitled to recover the excess.

The proof as to the excess cost of digging these holes in winter weather is unsatisfactory. Plaintiff, to prove its excess costs, undertakes to prove the cost of digging the holes for these piers and poles in warm weather and in winter weather, and by taking the difference. However, plaintiff does not give us the cost of digging all the holes in warm weather, but only the cost of a selected sample; nor does it give us the cost of digging all the holes in winter weather, but again only the cost of a selected sample. Comparing the samples selected it says the cost in warm weather was $15.29 a hole, and the cost in winter weather $37.30 a hole, an excess of $22.01 a hole.

It is difficult to believe it should be about 2½ times as expensive to dig these holes in winter weather as in warm weather. More expensive it undoubtedly was, but 2½ times as expensive seems to us so far out of line that we would have to have very cogent proof to accept it. Plaintiff does not give us the actual figures; we cannot accept this substitute computation that produces a result that seems to us so unreasonable. Indeed, plaintiff itself was loath to claim an excess of $22.01; it claims only $17.00.

The only proof of plaintiff's excess costs introduced by the Government was a statement by one of defendant's witnesses that an engineer of the A-E-M had estimated that the excess cost was $8.25 a hole. While this is by no means accurate, nor properly proven, it nevertheless seems to us to be closer to a reasonable figure than the figure produced by plaintiff.

On the state of the proof we can do no other than render a judgment in the nature of a jury verdict. We, accordingly, have found that the excess cost per hole was $9.00. At total of 2,232 holes were dug after December 1, 1944. Plaintiff is therefore entitled to recover on this item a total of $20,088.00.

▇▇▇ 2. Plaintiff also seeks to recover the excess cost to which it was put by reason of the alleged failure of the defendant to furnish it with electric power for its welding machines. (It was necessary for plaintiff to weld together the sections of pipe in order to construct the pipe line mentioned above.) The contractor brought on the job 23 electric welding machines for this purpose, but it alleges that it was unable to use all of them at times because the electric power was not available. It says this necessitated the use of gasoline-driven welding machines, which put it to additional expense.

Paragraph 1–26 of the specifications provides:

"1–26. Temporary Utilities:

"(a) Temporary Electric Power will be available at no cost to the Contractor in the immediate vicinity of the contemplated work. * * *"

Plaintiff says that electric power was not available close enough to enable it to use its electric-welding machines.

Paragraph 1–26(a) of the specifications also provides:

"On visiting the site, the Contractor shall ascertain the type of current available and before starting work, shall notify the A-E-M of his electric power requirements so that special arrangements may be made if the Contractor anticipates greater demands than available at the site of the work. * * *"

When, prior to submitting its bid, plaintiff's representatives visited the site they met Mr. Toennis of the Mason and Hangar Company, the engineer in charge of preparation of bidding-plans and specifications. Mr. Toennis accompanied them on the inspection trip. Plaintiff's representatives inquired of Mr. Toennis what was meant by the phrase, "in the immediate vicinity of the contemplated work," in the sentence providing that temporary power would be made available "in the immediate vicinity of the contemplated work." Mr. Toennis consulted with the A-E-M's electrical engineer, who, after investigation, advised plaintiff's representatives that electric power would be made available for its electric welding machines within 200 or 300 feet of the places where the welding had to be done.

In a number of instances electric power was not in fact available closer than 1,000 feet. Defendant's representatives insisted that plaintiff run leads from transformers for this distance, but, rather than do so, plaintiff used gasoline-driven welding machines. It does not seem to be disputed that it was more economical to do so. In order to secure the requisite electrical power from a transformer 1,000 feet away, much larger leads would have had to be used, and these leads would have had to be installed on poles. All of this would have increased the cost of using electrical power to such an extent that it was found to be cheaper to use the gasoline-driven welding machines.

The A-E-M area engineer admitted that if defendant was under the obligation to furnish the power for these machines every 300 feet that plaintiff was entitled to the excess cost of using the gasoline-driven welding machines for 1,577 machine days.

The excess cost of using gasoline-welding machines over the cost of using the electric-welding machines was $403.00 a machine month. 1,577 machine days equals 60.65 machine months, based on 26 working days a month. At $403.00 per machine month, plaintiff is, therefore, entitled to recover the sum of $24,441.95. However, defendant heretofore admitted that it had been necessary for plaintiff to use gasoline-driven welding machines for 9 machine months and has paid plaintiff $3,627.00 therefor. Deducting this amount from $24,441.95 leaves a balance of $20,814.95, which plaintiff is entitled to recover, if defendant is bound by the representations of Mr. Toennis and the electrical engineer, that electricity for the welding machines would be available within 200 or 300 feet of the place where the machines were to be used.

We think there is no doubt that the defendant is bound by these representations. The specifications directed the contractor to visit the site. On the site was defendant's representative who had drawn the bidding-plans and specifications. Inquiry was made of him as to what he meant by saying that electricity would be available in the immediate vicinity of the work. Mr. Toennis was not able to answer this until after consultation with the electrical engineer. This electrical engineer, apparently in Mr. Toennis' presence, advised plaintiff that it would be available within 200 or 300 feet of the place where the machines were to be used.

This was a representation made to plaintiff preliminary to its putting in its bid. It was made by defendant's representative who had prepared the plans and who was on the site of the work, evidently in anticipation of visits by prospective bidders, and to answer questions which bidders might propound. We have no doubt that the defendant is responsible for the representations made by him or by those persons to whom he referred plaintiff for the information requested. See Max J. Kuney v. United States, 95 Ct.Cl. 512, 519, 521.

Plaintiff is entitled to recover on this item the sum of $20,814.95. On the first

item it is entitled to recover $20,088.00, making a total of $40,902.95. Judgment for this amount will be entered. It is so ordered.

HOWELL, MADDEN, and LITTLE-TON, Judges, and JONES, Chief Judge, concur.