**CARLO BIANCHI AND COMPANY, Inc.,**
v.
**UNITED STATES.**
No. 466-54.

United States Court of Claims.
Jan. 14, 1959.

Robert W. Knox, Washington, D. C., for plaintiff. Robert F. Bradford, Boston, Mass., and William H. Matthews, Washington, D. C., were on the briefs.

Martin E. Rendelman, Chevy Chase, Md., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

MADDEN, Judge.

The plaintiff claims that in performing a contract with the Corps of Engineers of the War Department, it encountered changed conditions within the scope of Article 4 of its contract which caused it to incur extra expense for which the Government should have paid but did not.

The contract was made in July 1946. The plaintiff was to build an earthen dam across Canacadea Creek at Almond, Steuben County, New York. One item of the work was the blasting through rock of a tunnel some 710 feet long. The blasted area was to be approximately 17 feet in diameter and the finished bore after the construction of the concrete lining was to be 13 feet in diameter. All of the work under the contract was completed on time, the contract completion date, as extended, being June 30, 1949.

The Army Engineers had made test borings in the area through which the

tunnel was to be built. The invitation for bids, upon which the plaintiff had acted in submitting its bid, contained the standard provisions requiring the bidder to investigate the site and learn all that could be learned about the conditions which would be encountered in the performance of the contract. The plaintiff made a thorough examination of the nature of the rock, wherever it was exposed in the area, and of the logs of the test borings made by the Army Engineers. The logs of the borings indicated that, except for a distance of about fifty feet at each end of the tunnel, over which the rock covering would be relatively shallow, the rock through which the tunnel would pass would be "unweathered" rock, i. e. rock without seams in which clay or mud had accumulated. The importance of the unweathered condition of the rock is that such rock would better remain in place in the roof of the tunnel without vertical support when the tunnel was blasted through.

The specifications contemplated instability of the rock for fifty feet at each end of the tunnel. They provided for the insertion in these locations of strong steel ribs set four feet apart, with steel "liner plates" one-eighth of an inch thick on top of them.

The plaintiff's excavation subcontractor, experienced in tunnel work, blasted out the tunnel. A good deal of rock fell from above the required height of the tunnel. The fall from the blasting and the overbreak was "mucked" out by the night crew. No cribbing or other temporary protection against falling rock was used at this stage of the work. The blasting through of the tunnel was begun in December 1946 and finished by March 12, 1947, all in winter weather.

Because of the considerable excess fall of rock while the tunnel was being blasted through, the plaintiff requested the Government's resident engineer to authorize the installation of steel ribs and liner plates through the entire length of the tunnel, this additional material to be paid for by the Government. The resident engineer replied that unless there were indications that the tunnel would cave in, such authority would not be given.

The plaintiff, in correspondence during the next several months, repeated its request, which the Government repeatedly denied. The plaintiff caused the situation to be examined by several experts. They found that, throughout the length of the tunnel, the rock contained seams filled with mud and clay; that these seams were saturated with water and offered little resistance to the fall of the rock when its vertical support had been removed. Since the tunnel had been blasted through in the winter when no moisture could enter the ground from the surface, which was about 100 feet above the tunnel, the rock was relatively stable at that time. When the ground at the surface thawed and the spring rains came, the saturation of the seams in the rock occurred or was increased, as was the instability of the overlying rock.

In the disputation in the writings of the parties, the Government took the position that all that was needed was "temporary protection" sufficient to enable the workmen to safely clear out the tunnel and construct the concrete lining. If that was all that was needed, it was no more than the plaintiff had contracted to do, at its own expense. Such protection would, apparently, have been wooden cribbing, sufficiently strong to prevent a relatively small volume of rock from crashing to the floor of the tunnel.

The plaintiff's contention was, and is, that the rock above the tunnel was so unstable that unless "permanent protection" was installed, of a kind which would have to remain imbedded in the concrete lining of the tunnel, not only would the workmen be endangered but the tunnel could not be completed because of the danger of large falls of rocks which would make it impossible or impracticable to properly construct the concrete lining.

On May 5, 1947, the contracting officer formally notified the plaintiff that it was his decision that no additional steel tun-

nel lining would be authorized to be placed at the expense of the Government. The plaintiff, on May 29, filed an appeal from the contracting officer's decision. It also renewed its request to the contracting officer for approval of the steel permanent protection which it proposed to use. On June 13, 1947, the contracting officer advised the plaintiff that it might install the proposed steel protection if it chose to do so, but that the Government thought that the installation was more expensive than was necessary; that nothing more than temporary protection, which the plaintiff was under a duty to furnish, was necessary; and that the Government would not pay the cost of either kind of protection. This letter suggested and recommended to the plaintiff a lighter and less expensive type of protection.

The plaintiff in further correspondence, informed the contracting officer of the advice which it had received from expert consultants that the type of protection recommended by the contracting officer would be inadequate and unsafe. It then proposed a design, of steel protection, with detailed specifications, and requested approval of the design. On August 11, 1947, the contracting officer approved the use of the plaintiff's design, saying, however, that it was unnecessarily strong and expensive and that the Government would not pay for it unless higher authority reversed his decision. The plaintiff then proceeded to install the permanent protection and completed the lining of the tunnel on May 8, 1948.

The Claims and Appeals Board denied the plaintiff's appeal on December 14, 1948.

The evidence does not tell us in detail what the process of constructing the lining of the top of the tunnel would have been, if only temporary protection had been installed, so that there would have been no steel ribs and lining plates to serve as a form for the lining. Presumably, removable wooden forms would have been used and the space above them would have been packed with rocks and concrete and the voids filled with cement grouting. The evidence seems to us to be quite overwhelming that, the condition of instability of the rock above the tunnel being what it was, it would not have been practicable to construct the lining of the tunnel by that method. There would quite certainly have been a large number of heavy rock falls during the several months of the construction of the tunnel lining, and the rearrangement of the fallen rocks and the packing of the voids in such a way that the arch of the tunnel would support the unstable weight above it, when the forms were removed, would have been a difficult if not an impossible task. All the risks of the success of this task would have fallen on the plaintiff, since it had contracted to construct a permanent and usable tunnel.

The plaintiff says, and we have found as a fact, that the weathered and unstable condition of the rock through which the tunnel was blasted was an unforeseen condition. The contract contained the usual Article 4 of Government construction contracts, relating to subsurface or latent unforeseen conditions. The Article is quoted in our findings of fact. The unforeseen condition having arisen, the Government was under a contractual duty to pay the plaintiff the cost of solving the difficulty. The contracting officials were adamant in their position that "temporary protection" would solve the problem. It is possible that it would have, but the evidence to the contrary was so strong that it would have been foolhardy of the plaintiff to proceed on the Government's advice, but at the plaintiff's own risk.

We get from the record the impression that the Government officials, in their correspondence with the plaintiff in the spring and summer of 1947, kept their minds almost exclusively upon the text of the contract, and paid little attention to the conditions in the tunnel. Those conditions had changed importantly after the spring thaw and rains had saturated the unforeseen clay and mud in the seams of the rocks. The communications of the Government officials kept

harking back to the duty of the contractor to examine the site and the test borings and learn what could be learned about the difficulties which would be encountered. But the plaintiff had done that, and had not learned of the difficulties which in fact developed. The purpose of Article 4 of the contract was to insure the contractor against that very contingency.

The contract required the contractor to protect its workmen against harm from falling rocks, and to produce a safe, solid, usable tunnel. We think the Government officials felt that they could save the Government money and at the same time subject the Government to no risk, by standing on the terms of the contract. If the temporary protection which they insisted was sufficient did not produce a good tunnel, the contractor was still obligated to produce a good tunnel, and the Government could not lose by the experiment.

The Government urges that the plaintiff's difficulties were of the plaintiff's own making; that if it had proceeded immediately to line the tunnel after it had holed it through, the rock would not have been so unstable. The Government urges that the strong current of air which blew through the tunnel after it was holed through made the rock unstable, and that the tarpaulin coverings over the openings were not sufficiently airtight. It would be difficult to maintain an airtight seal over the ends of a tunnel which was being worked in. And we think a current of air blowing through a tunnel, the roof of which was dripping with water, would have had no significant effect upon the stability of the rock in and above the roof.

The Government claims finality for the decision of the contracting officer, affirmed by the Claims and Appeals Board. Under the Act of May 11, 1954, 68 Stat. 81, 41 U.S.C.A. §§ 321, 322, the "Wunderlich Act", that decision does not have finality unless it is supported by substantial evidence. We think that on consideration of all the evidence, the contracting officer's decision cannot be said to have substantial support.

The Government urges that in this case the plaintiff did not present its case fully to the Claims and Appeals Board, since it presented only four witnesses before the Board, but presented fifteen witnesses at its trial in this court. The Government says that the plaintiff used the Board as a mere waystation in its progress to this court, and thus did not give the Board a fair chance to decide the case on substantially the same evidence which has been presented in this court. So far as concerns the difference in the number of witnesses, several of the additional witnesses in this court gave unimportant testimony. But some of the expert witnesses who did give important testimony in this court, did not testify before the Board.

In our opinion in Volentine and Littleton v. United States, 145 F.Supp. 952, 136 Ct.Cl. 638, holding that the trial in this court should not be limited to the record made before the contracting agency, but should be de novo, we recognized that there were logical weaknesses in our position. We concluded, however, that the intent of Congress in enacting the Wunderlich Act was in accord with our conclusion, and we adhere to that conclusion in this case.

The plaintiff claims that, in addition to the extra expense of installing the permanent steel protection in the tunnel, it was put to extra expense by being delayed by the contracting officer's refusal for a considerable time to authorize it to install the permanent protection. The plaintiff says that the delay threw the work of constructing the concrete lining of the tunnel into the winter months, so that it had to heat its concrete and incur other extra costs on that account. We have found that there was delay and expense resulting from the cause alleged by the plaintiff. F. H. McGraw & Co. v. United States, 82 F. Supp. 338, 113 Ct.Cl. 29.

By stipulation of the parties, the instant proceeding has been limited to

the decision of the question of liability. Our conclusion is that there is liability of the defendant to the plaintiff. The amount of the plaintiff's recovery will be determined pursuant to Rule 38(c), 28 U.S.C.A.

It is so ordered.

McLAUGHLIN, District Judge, sitting by designation, JONES, Chief Judge, and WHITAKER, Judge, concur.

LARAMORE, Judge, took no part in the consideration and decision of this case.