**AMINO BROTHERS COMPANY, Inc.**

v.

The **UNITED STATES.**

No. 158–62.

United States Court of Claims.

Feb. 17, 1967.

John A. Biersmith, Kansas City, Mo., attorney of record for plaintiff. Rafter, Biersmith & Walsh, Kansas City, Mo., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

SKELTON, Judge.[*]

In this case, the plaintiff sues to recover damages in the sum of $301,530 incident to two washouts of a low-water crossing and the delay of work resulting therefrom. It claims entitlement to such amount as an equitable adjustment under the "Suspension of Work" and "Changed Conditions" clauses of a contract which it executed with the United States Army Corps of Engineers for the construction of a flood control project, and as damages for an alleged breach of such contract.

The defendant interposed the sovereign act doctrine, and the finality of findings of fact determined in its favor by the Corps of Engineers Board of Contract Appeals (hereinafter referred to as the "Board") under the "Disputes" clause of the contract. Before reaching the merits of the claim, we face a threshold procedural inquiry which necessitates relating the chronology of the administrative and judicial proceedings in this case.

Plaintiff's claim was denied by the contracting officer and ultimately by the Corps of Engineers Board of Contract Appeals in a written opinion dated April 18, 1961 (Eng. BCA No. 1582). Plaintiff's motion for reconsideration and/or rehearing was denied on January 25, 1962 (Eng. BCA No. 1582). Thereupon, plaintiff filed his petition in this court on May 14, 1962, and on June 9, 1964, the defendant's motion for an order restricting the trial to a review of the record of the Board was denied by the trial commissioner. The defendant appealed within the procedures for review afforded it by Rule 55(a) (3),[1] but we denied defendant's request for review, without prejudice, on July 29, 1964, and the case was scheduled for a de novo trial. The report of the commissioner was rendered on March 25, 1966, after a de novo hearing, accompanied by his findings of fact.

We wish to point out that our denial of the defendant's request for review without prejudice, and the hearing before the commissioner was prior to the decisions of the Supreme Court in United States v. Utah Construction Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), and United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966), and we and the commissioner did not have the benefit of those decisions. In view of the holding in those cases, we recognize that we are bound by the Board's findings of fact

---

[*] This opinion contains all necessary findings of fact. The court acknowledges the helpfulness of the recommended opinion prepared, at its direction, by Trial Commissioner Paul H. McMurray, although

we reach different legal conclusions as to some of the issues in the case.

1. No question concerning waiver by the defendant has been raised.

if they are supported by substantial evidence, and we hold that they are, and that our decision must be, and is accordingly, based thereon.

■ We feel, however, that in view of the opinion of the parties and the commissioner to the effect that the evidence adduced at the trial de novo was the same as the evidence presented to the Board, it would not be productive to undertake the laborious task of searching each and every subsidiary finding to ascertain whether it is supported, or can be supported, solely on evidence presented to the Board. Since our conclusions and critical findings all rest upon the Board proceedings and the judicial record, it is unnecessary to engage in the useless and burdensome process of combing each of the preliminary findings. Cf. Hunt and Willett, Inc. v. United States, 351 F.2d 980, 982, 168 Ct.Cl. 256, 260 (1964).

The facts giving rise to plaintiff's complaint are as follows:

Plaintiff, a corporation and a general contractor, experienced in flood control work, entered into a contract with the United States Army Corps of Engineers on February 4, 1957, to build a cutoff channel and to construct a flood control levee for the total sum of $202,316 on the Smoky Hill River at Salina, Kansas. The contract required the plaintiff to make an excavation of 3,948 feet and to use the excavated materials to construct a flood control levee of approximately 15,000 feet. This construction required that the excavated materials be transported across Smoky Hill River. The contract provided that the plaintiff "may construct for his own use" low-water crossings on the Smoky Hill River as follows:

\* \* \* \* \*

2–13. *Channel Crossings.* The contractor may construct for his own use

within the right-of-way, low water crossings on the Smoky Hill River in strict accordance with the following:

a. Provide for not less than 64 square feet of effective opening in the channel at each crossing.

b. The flow line of the openings shall be set at the flow line of the existing channel.

c. The Contractor shall remove the crossings whenever in the opinion of the Contracting Officer the river stage would be adversely affected.

d. The crossings shall be used for the sole purpose of the Contractor's hauling equipment.

e. The Contractor shall remove the crossings upon completion of the work or whenever its use is no longer required.

\* \* \* \* \*

The specifications which formed a part of the contract contained a clause showing approximate weather conditions at the site with monthly precipitation in inches, but provided that:

\* \* \* each bidder should satisfy himself before submitting his bid as to the hazards likely to arise from weather conditions. Complete weather records and reports may be obtained from the U. S. Weather Bureau. \* \*

Such specifications also contained a provision with reference to site investigation which stated that the contractor had satisfied himself as to the nature and location of the work, the general and local conditions, roads and uncertainties of weather, river stages, tides or similar physical conditions at the site.

The contract contained "Suspension of Work", "Changed Conditions" and "Disputes" clauses usually found in government contracts of this kind.[2]

---

2. *"Suspension of Work.* The Contracting Officer may order the Contractor to suspend all or any part of the work for such period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Un-

less such suspension unreasonably delays the progress of the work and causes additional expense to the Contractor, no increase in the contract price will be allowed. In the case of suspension of all or any part of the work for an un-

The title pages of the specifications of this project were headed by the words, "Flood-Protection Project, Kansas River Basin, Smoky Hill River, Kansas." It appears from the evidence that during the 6 years immediately preceding the beginning of this project there had been a severe drought along this part of the river, although in 1950, about 6 years before plaintiff started work on this contract, there had been a disastrous flood along Smoky Hill River where plaintiff was required to work under the contract involved here.

Also, there was a flood control dam, known as Kanopolis Dam, located 88 miles upstream from the work site, and several miles further upstream was Cedar Bluff Dam. Both of these dams were being operated by the United States Army Corps of Engineers as flood control dams and the Kanopolis Dam was built primarily for flood control purposes. Water was retained in these reservoirs during periods of excessive rain and as conditions permitted, flood waters were released until the flood storage capacity of the reservoirs was restored. The Reservoir Regulation Manual of the United States Army Corps of Engineers for operating the Kanopolis Reservoir required the release of water from the dam at certain specified rates of flow when the water reached designated levels in the reservoir. The District Engineer of the United States Army Corps of Engineers made the decisions from time to time as to when water should be released through the dam in operating it for flood control purposes.

In addition, there was an uncontrolled outlet in the dam which was called the "uncontrolled notch", which allowed water to escape through the dam at various

reasonable length of time causing additional expense, not due to the fault or negligence of the Contractor, the Contracting Officer shall make an adjustment in the contract price in the amount of the additional proper expense and modify the contract accordingly. An extension of time for the completion of the work in the event of any such suspension will be allowed the Contractor; provided, however, that the suspension was not due to the fault or negligence of the Contractor.

"*Changed Conditions.* The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) sub-surface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.

"*Disputes.* Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence, be final and conclusive; provided that, if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision."

rates of flow when the water level exceeded 1,459 ft. mean sea level. There was no way of controlling flows through the uncontrolled notch when water exceeded this level in the reservoir. Furthermore, the drainage area between the Kanopolis Dam and the work site encompassed 368 square miles and there was no way of controlling the run-off in this area during times of heavy rainfall.

The plaintiff knew from drawings and maps that were furnished to it in connection with the bidding and execution of the contract that the Kanopolis Dam was located 88 miles above the work site and that it was being operated as a flood control dam.

Plaintiff constructed a low-water crossing across Smoky Hill River and used it to haul excavated material across the river from March 6, 1957, through May 11, 1957. Heavy rains occurred on or about the latter date, and on or about May 17, 1957, the high water in the river caused by the heavy rains washed out the low-water crossing. The evidence showed that the low-water crossing would be washed out when the flow in the river reached 860 cubic feet per second (c.f.s.) and that it could not be rebuilt until the flow of the river was reduced to 250 c.f.s. On May 17, 1957, when the low-water crossing was washed out, the flow of the river reached 2,930 c.f.s., most of which came from the natural run-off in the 368-square mile drainage area between the Kanopolis Dam and the work site. The records of the Army Engineers showed that at that time only 500 c.f.s. of water, controlled and uncontrolled, came from the Kanopolis Dam and of this amount, only 200 c.f.s. of water came from the operation of the floodgates at the dam. Accordingly, it was clearly established and is uncontroverted that the first washout of the low-water crossing was caused by the natural run-off between the Kanopolis Dam and the work site, and that the operation of the floodgates at the dam by defendant had nothing to do with it.

Heavy rains upstream from the Kanopolis Dam continued from May 17, 1957, until September 5, 1957, when the flow in the river was reduced sufficiently to enable the plaintiff to rebuild the low-water crossing, which was done. Plaintiff used the second low-water crossing from September 5, 1957, to September 14, 1957, when the rains began again, and on the latter date the flow of the river at the crossing reached a peak of 837 c.f.s. which caused the loss of some of the topping on the crossing. This loss was not due to the operation of the flood gates at the Kanopolis Dam, because they had been completely closed since August 31, 1957. However, on September 16, 1957, the local engineer of the United States Army Corps of Engineers at the work site notified the District Engineer who was in charge of operating the floodgates at the Kanopolis Dam for flood control purposes that the plaintiff's low-water crossing had been washed out the second time. The District Engineer issued orders to open the floodgates at the Kanopolis Dam to increase the discharge of water to 2,200 c. f. s. The local engineer learned that he had acted on erroneous information, and that plaintiff's crossing had not been washed out completely but only that the surface had been damaged, and it had already been repaired by the plaintiff. He communicated again with the District Engineer in an attempt to stop the release of any water through the floodgates at the Kanopolis Dam, but was told that the water had already been released and was flowing down the river toward plaintiff's crossing. The flood water in the reservoir had reached such a high stage it was necessary to release water from the dam in its operation as a flood control dam for the protection of the dam and life and property downstream.

The plaintiff, upon learning that the water was coming down the river, voluntarily removed parts of the crossing which could be salvaged before the water reached it. In due time, the water reached the crossing and completely washed it out on September 19, 1957. At that time the discharge of water through the control gates at the Kanopolis Dam was

1,230 c. f. s. and was without doubt the major cause, if not the sole cause, of washing out plaintiff's low-water crossing the second time.

High rains continued from September 18, 1957, to October 4, 1957, when plaintiff was able to again rebuild his low-water crossing and finish the work under the contract. By various modification orders issued by the defendant, the plaintiff was allowed sufficient additional time within which to finish the contract without having to pay any liquidated damages, but such modification orders did not provide any adjustment in the contract price or reduce costs of performing the contract under the conditions set out above.

The plaintiff contended before the Board that it was entitled to damages because defendant misled it by various statements made, writings furnished, and information withheld by defendant's representatives at the time the contract was signed. This was with reference to rainfall, floods, stages of the river, operation of the Kanopolis Dam as a flood control dam and its effect on the work site operations of the plaintiff. The Board found facts on these points (which findings are not listed in detail here), which were supported by substantial evidence, and were against the plaintiff. It correctly held that plaintiff was not entitled to recover on such contentions.

The plaintiff also claimed before the Board that it was entitled to the damages sought as an equitable adjustment of the contract price by reason of the "Suspension of Work" and "Changed Conditions" clauses of the contract in view of the two washouts of its low-water crossing and the delays caused thereby.

■ The Board found with respect to the first washout that it was caused solely by heavy rainfall and natural run-off of uncontrolled flood waters from the 368-square mile drainage area between the Kanopolis Dam and the crossing, and that defendant's operation of the dam did not in any way contribute to it. This was clearly an Act of God for which defendant could not be responsible. It did not require the contracting officer to issue a suspension of work order within the meaning of the contract provisions because such acts of nature were not "necessary or desirable for the convenience of the Government," and were completely beyond the control of such officer and the defendant. The defendant was not an insurer for plaintiff against acts of nature. Banks Construction Co. v. United States, 364 F.2d 357, 367, 176 Ct.Cl. ——, —— (1966).

■ Neither was the first washout a changed condition within the meaning of the contract so as to entitle plaintiff to any relief. The Board found that plaintiff was experienced in flood control work and was actually engaged on a flood control project on Smoky Hill River where a disastrous flood had occurred six years before. It also found that: (1) the specifications for this contract bore the words "Flood-Protection Project—Smoky Hill River, Kansas"; (2) plaintiff was in fact building a flood control levee with excavated materials; and (3) plaintiff knew of the existence of the Kanopolis Dam and that it was being operated as a flood control dam. Furthermore, it was required by the contract to satisfy itself as to rainfall, river stages, site conditions, and weather. Under these facts, plaintiff should have reasonably anticipated that rains would fall and floods would occur on the river which would have an effect on the river stages at the location of its low-water crossing. Therefore, we hold that the floods which caused the first washout were not "changed conditions" within the meaning of the contract, but were a part of the hazards of the undertaking which plaintiff assumed when it signed the contract.

■ The second washout of plaintiff's low-water crossing was caused by an entirely different set of circumstances. The Board found that the District Engineer of defendant opened the flood gates of the Kanopolis Dam while under the mistaken belief that rains had already washed out plaintiff's crossing, and that

such flood waters so released was the sole cause of the second loss of the crossing. However, it was established that the level of the water in the reservoir was so high it was necessary for the flood waters to be released. These facts were not controverted by the plaintiff and must be accepted as final. It is our opinion that the defendant released the water in accordance with its own regulations and as a part of its duty to the public to operate the dam as a flood control project to protect the dam and lives of people and their property located downstream from the dam.

■ We hold that the defendant in releasing the water from the Kanopolis Dam which caused the second washout of plaintiff's crossing was acting in its sovereign capacity and that its action in so doing, affected the public generally and was not directed solely toward the plaintiff. It has long been held that the United States as a contractor cannot be held liable directly or indirectly for public acts of the United States as a sovereign. Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925); Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455 (1963), cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111; Bateson-Stolte, Inc. v. United States, 305 F.2d 386, 158 Ct.Cl. 455 (1962); J. B. McCrary Co. v. United States, 84 F.Supp. 368, 114 Ct.Cl. 12 (1949); Jones v. United States, 1 Ct.Cl. 383 (1865).

■ The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act. Gerhardt F. Meyne Co. v. United States, 76 F.Supp. 811, 110 Ct.Cl. 527 (1948); Sunswick Corp. of Del. v. United States, 75 F.Supp. 221, 109 Ct.Cl. 772 (1948), cert. denied, 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755.

■ This requires us to decide whether or not the defendant promised in the contract that it would do no sovereign act that would hinder the plaintiff in the execution of the contract. Certainly, there was no express promise by the defendant in the contract that it would not release any water from the Kanopolis Dam in operating it as a flood control project, nor do we believe there was any implied promise by defendant that it would not do so.

Plaintiff argues that the provision in the contract stating that the plaintiff "may construct for his own use * * * low water crossings * * *" in accordance with certain specifications amounted to an implied promise or guarantee on the part of the defendant that the low-water crossing if constructed would always be there for the use of the plaintiff, and that if destroyed, the defendant would pay the consequent damages for such destruction. We do not so interpret the contract. The contractor had a choice of building a low-water crossing or a high-water crossing, or of devising some means of transferring the excavated material across the river other than by the use of a low-water crossing. We find nothing in the contract that could be said to be an express or implied promise, on the part of the defendant that it would not perform any sovereign act, such as the release of the water from the Kanopolis Dam, which would preclude use by the plaintiff of the low-water crossing or hinder it otherwise in the performance of its contract.

■ We find it unnecessary to pass upon the question of whether the plaintiff is entitled to an equitable adjustment of the price of its contract by reason of its provisions pertaining to "Changed Conditions" and "Suspension of Work", with respect to the second washout of the crossing, since the absence of a promise by the Government, express or implied, that it would not exercise a sovereign power which would hinder the plaintiff in the execution of its contract, precludes any recovery by the plaintiff because of the sovereign act doctrine. We also conclude that it is unnecessary to consider the applicability of the Act of May 15,

1928, 45 Stat. 535, 33 U.S.C. § 702c (1964),[3] as a defense to plaintiff's suit in light of the foregoing disposition of the issues in this case. Accordingly, plaintiff is not entitled to recover and the petition is dismissed.

3. This section provides in pertinent part: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: * * *."