**ACE CONSTRUCTION COMPANY,**
a corporation

v.

**The UNITED STATES.**

No. 3–67.

United States Court of Claims.
Oct. 18, 1968.

James F. Kasher, Omaha, Neb., for plaintiff; William G. Campbell, Omaha, Neb., attorney of record.

J. Michael Gottesman, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

COLLINS, Judge.

This case is before the court on cross-motions for summary judgment.

Ace Construction Company, the plaintiff, entered into a contract with the United States Corps of Army Engineers on August 6, 1959, for the construction of a channel, levees, and appurtenances on Soldier Creek near Topeka, Kansas. The Government was to establish base lines and bench marks; in addition, it was to make original and final surveys and compilations to determine the quantities of work performed or finally in place. Plaintiff was responsible for the layout of the work and, under the supervision and direction of the contracting officer's representative, was to make quan-

tity surveys for purposes of partial progress payments.[1]

Under the terms of the contract, excavated materials not used for purposes of construction were to be placed in "waste areas" designated by the Government. These waste areas were of two types: "Required Waste Areas" were to be filled with excavated materials in accordance with the grades and limits specified. Additional areas, termed "Available Waste Areas," were provided for the disposal of excavated materials in excess of the requirements of construction and the required waste areas. The filling of waste areas was not a separate pay factor; the unit price per cubic yard of excavation included fill expense.

Work began at the eastern end of the site in August 1959. Because of the dense foliage, surveying operations generally had to follow the clearing crews. Most of the time, both the Government and the contractor had survey teams at the site, and they worked together.

Plaintiff soon discovered that there would be an excess of material at the eastern end of the job. At its request, an additional available waste area (No. 59) was designated by means of a contract modification. This modification, executed by plaintiff's vice president, contained the qualification that "No part of required waste areas shown on the contract drawings shall be unused in order to place waste excavation in No. 59."

The controversy in this case centers upon Required Waste Area No. 34, at the westernmost end of the site. At an informal meeting in June 1960, the excavation-fill balance for the western end of the job was discussed.[2] The conclu-

---

Since plaintiff's argument rests largely upon paragraph SC–13 of the contract, it is quoted here in its entirety:

"SC–13. *Layout of Work and Serveys. a. Layout of Work.* (1) The Government will establish the following base lines and bench marks at the site of the work:

"Levee P.I.'s

Channel P.I.'s

Bench marks as indicated on the drawings

"(2) From the base lines and bench marks established by the Government, the Contractor shall complete the layout of the work and shall be responsible for all measurements that may be required for the execution of the work to the location and limit marks prescribed in the specifications or on the contract drawings, subject to such modifications as the Contracting Officer may require to meet changed conditions or as a result of necessary modifications to the contract work.

"(3) The Contractor shall furnish, at his own expense, such stakes, templates, platforms, equipment, tools and material, and all labor as may be required in laying out any part of the work from the base lines and bench marks established by the Government. It shall be the responsibility of the Contractor to maintain and preserve all stakes and other marks established by the Contracting Officer until authorized to remove them, and if such marks are destroyed, by the Contractor or through his negligence prior to their authorized removal they may be replaced by the Contracting Officer, at his discretion, and the expense of replacement will be deducted from any amounts due or to become due the Contractor. The Contracting Officer may require that work be suspended at any time when location and limit marks established by the Contractor are not reasonably adequate to permit checking of the work.

"*b. Quantity Surveys.* (1) The Government will make original and final surveys and make compilations to determine the quantities of work performed or finally in place.

"(2) The Contractor shall make such surveys and computations as are necessary to determine the quantities of work performed or placed during each period for which a progress payment is to be made. All original field notes, computations, and other records taken by the Contractor for the purpose of progress surveys shall be furnished promptly to the representative of the Contracting Officer and shall be used to the extent necessary in determining the proper amount of progress payments due to the Contractor. Unless waived in each specific case, quantity surveys made by the Contractor shall be made under the direction of a representative of the Contracting Officer."

2. It is undisputed that none of the Government personnel present at the meeting was an officially designated representative of the contracting officer.

sion reached at the meeting concerning Required Waste Area No. 34 and the basis therefor are disputed. Plaintiff's version is that a joint Government-contractor survey of the area was completed shortly before the meeting, and the consensus at the meeting was that the quantity of fill needed for No. 34 was 20,000 cubic yards. The Government takes the position that no surveys of waste areas were ever taken by its agents, since waste-area fill involved no separate pay factor. Furthermore, one of the Government's witnesses testified that the conclusion reached at the meeting was that area No. 34 might require between 20,000 and 60,000 cubic yards. No formal findings were made by the Board regarding either of these matters.

Subsequent to the meeting, plaintiff proceeded to dispose of several thousand cubic yards of material in Available Waste Area No. 38, upon the apparent assumption that a sufficient quantity of fill remained to meet the requirements of No. 34. Plaintiff thereafter hauled 30,000 cubic yards into Waste Area No. 34, but it still was not filled.

In January 1961, plaintiff notified the Government of the shortage of fill and inquired if the Government had access to material for filling purposes. The Government responded that balancing excavation and fill was a problem for plaintiff under the contract. Plaintiff proceeded under protest to acquire the necessary fill elsewhere and completed the job to the Government's satisfaction.

The shortage of fill for Required Waste Area No. 34 was in excess of 50,000 cubic yards. The reason for the unexpected requirements of the area, apparently a surprise to both parties, has not been determined. One of plaintiff's witnesses suggested, however, that the presence of an old riverbed underlying the area made the shrinkage allowance used inadequate. There is no dispute that there was no shortage of fill material if the job is considered as a whole.

Pursuant to the Disputes clause of the contract, plaintiff filed notice of its claim for damages in the amount of $131,065.23 with the contracting officer on November 17, 1961. The claim was formally denied on June 26, 1964. An appeal was filed with the Corps of Engineers Board of Contract Appeals, by whom the claim was also denied, after a hearing, on April 19, 1966. A petition was then filed in this court, and the motions presently before the court were timely filed thereafter.

In the brief in support of its motion for summary judgment, plaintiff assigns as error (1) the Board's finding that the Government was not required to survey waste areas; (2) its determination that the Government did not have the contractual obligation to balance excavation and fill; (3) its failure to resolve the issues of whether a joint survey of area No. 34 was made and whether the consensus at the meeting was that 20,000 cubic yards were needed therefor; and (4) its failure to render judgment for the plaintiff when it made an effective finding of changed conditions. It is our considered opinion that plaintiff's contentions are without merit. We will examine each of these points separately.

I.

Plaintiff contends that the Board erred in finding that the Government did not have the contractual obligation to make original field surveys of the construction site, including waste areas. Plaintiff's allegations that the Government had the duty to balance excavation and fill and that the Government misrepresented the capacity of area No. 34—at the meeting and through the joint survey—also rest heavily upon the determination of this issue. From reading the entire contract, as is appropriate (Trans Int'l Airlines, Inc. v. United States, 351 F.2d 1001, 173 Ct.Cl. 312 (1965)), we determine that the only reasonable interpretation of its provisions is that the Government was not responsible for making surveys to include waste areas.

Plaintiff relies upon paragraph SC–13 of the contract to support its position.

This paragraph has two basic subdivisions. The first of these, *"Layout of Work,"* requires the Government to establish the base lines and bench marks [3] at the site and obligates the contractor to lay out the work and take all measurements necessary for performance in accordance with the specifications set. It seems clear from the contract language that the contractor was to have complete responsibility for all engineering or surveying work necessary to complete performance within this geographic framework.

The second subdivision of paragraph SC–13 is entitled *"Quantity Surveys."* It is observed that the type of surveys described here is intended by the syntax to be distinct from the type of surveys necessarily involved in the subdivision *"Layout of Work."* Again, the structure of this subdivision parallels an obligation of the Government with a corresponding and complementary duty of the contractor.

It is important in considering this section to note that paragraph 3–12 of the Technical Provisions expressly provided that the filling of waste areas would not involve a separate pay factor. Instead, as that paragraph and paragraph 2–09 of the Technical Provisions provided, payment for excavation, which included the cost of filling operations, was by unit price per cubic yard.

Plaintiff, stressing the use of the conjunction "and," argues that subparagraph (1) of *"Quantity Surveys"* places two separate obligations upon the Government: (1) to "make original and final surveys"; (2) to "make compilations to determine the quantities of work performed or finally in place." The first of these obligations, plaintiff states, requires the Government to make surveys of the entire site, including waste areas.

■ This interpretation ignores the sense of the whole subdivision. Clearly, the phrase in subparagraph (1) beginning with the word "compilations" would be out of context if it had no relation to the surveys mentioned in the first part of the subparagraph and in the subdivision title. Moreover, the same parallel, between "surveys" and "computations" for pay purposes, is contained in subparagraph (2), referring to the contractor's obligations. The surveys described in the second subparagraph are undoubtedly "quantity surveys," as indicated by the last sentence in the subparagraph. Also, it is clear from this subparagraph that the term "quantity surveys" refers to surveys for pay purposes, as distinguished from surveys for job layout and planning.

When the language of subparagraph (1) is considered in the light of this analysis, and when that subparagraph is read in contradistinction to the first subdivision, *"Layout of Work,"* and in conjunction with paragraphs 3–12 and 2–09, plaintiff's interpretation becomes unduly strained. We therefore find no ambiguity in paragraph SC–13*b*. Even should this paragraph be considered ambiguous, however, plaintiff still cannot prevail. Before an ambiguous provision can be construed against its drafter, the ambiguity must be a substantial and reasonable one. Southern Constr. Co. v. United States, 364 F.2d 439, 176 Ct.Cl. 1339 (1966); Keco Indus., Inc. v. United States, 364 F.2d 838, 176 Ct.Cl. 983 (1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967).

■ On the other hand, plaintiff's interpretation tends to create ambiguity in paragraph SC–13*a*. As we have said,

3.  A base line is defined as a line extending east and west from a chosen reference point on a principal meridian and forming with the meridian a pair of coordinate axes for locating township and section corners. A bench mark is defined as a mark on a fixed and enduring object, indicating a particular elevation and used as a reference in topographical surveys and tidal observations. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 181, 203 (1965).

It is not disputed that the Government established the required lines and marks.

the clear intent of that provision was to require the Government to establish the topographical outline of the project; plaintiff was then to be "responsible for all measurements" necessary for performance in accordance with the defendant's specifications. If, as plaintiff urges, the Government was required by paragraph SC–13b(1) to make initial field surveys, the plaintiff would seem to have been relieved of any substantial responsibility for subsequent "measurements," since any mistakes resulting from computations based upon surveying errors would appear to have been chargeable to the Government, not the plaintiff. Moreover, since, under plaintiff's interpretation, the Government would have been required to make similar final field surveys, the plaintiff would not seem to have had any meaningful obligation regarding "measurements" at all: plaintiff's job would have consisted of excavating, moving, and filling in accordance with the Government's initial survey and subject to its approval by the final survey. Any measurements plaintiff would have had to take would be primarily for its own benefit, to make certain it was performing properly, and not in order to lay out the work. Plaintiff's interpretation of the second part of paragraph SC–13 conflicts, therefore, with the clear intention of the parties as expressed in the first part of that same paragraph. Under established principles, preference is given to an interpretation of a contract which accords reasonable meaning to each of its provisions. Womack v. United States, 389 F.2d 793, 182 Ct.Cl. 399 (1968).

We hold that there is no ambiguity in paragraph SC–13 and that the Board did not err in finding that the Government was not responsible for initial surveys to include waste areas.

## II.

Plaintiff seeks to reverse the Board's decision on the ground that its finding that the Government did not have the contractual responsibility to balance excavation and fill was in error. The Government argues that the terms of the contract clearly place this responsibility upon the plaintiff.

Plaintiff supports its position by pointing to the numerous provisions of the contract which require approval of the contractor's plans or actions by the contracting officer, or which give the contracting officer the right to modify or change grades, limits, or other specifications. Typical of these provisions is paragraph 2–02 of the Technical Provisions, cited in plaintiff's brief:

> 2–02. *Equipment and Operations.* a. *General.* The excavation may be carried on by any approved method and by use of excavating and hauling equipment suitable for the work. All excavation operations shall be performed in accordance with a schedule of operations submitted by the Contractor and approved by the Contracting Officer. * * *

Plaintiff argues that "approval," as used in the contract, means, a fortiori, "control."

Perhaps plaintiff is correct in stating that the Government "controlled" the overall construction project, in the broad sense that the Government retained sufficient supervisory power to see that the contract would be performed reasonably in accordance with its needs and time limitations. But this is no more than intelligent concern to protect the interests which were the reason for the contract in the first place. Moreover, in a construction project of this magnitude, it is completely reasonable to allow sufficient flexibility in the contract provisions to cope with unexpected problems and changing circumstances as they arise. The handling of minor details was wisely left in the contracting officer's discretion by contractual agreement: had it been otherwise, the number of formal contract modifications necessary might well have become burdensome for both parties.

More importantly, however, the provisions of the contract itself and plaintiff's actions thereunder militate against the

narrow interpretation plaintiff urges. Paragraph SC–13a(2) provided in part that

> * * * the Contractor shall complete the layout of the work and shall be responsible for all measurements that may be required for the execution of the work to the location and limit marks prescribed in the specifications or on the contract drawings * * *.

Subparagraph b(2) of that paragraph provided that the contractor "shall make such surveys and computations as are necessary to determine the quantities of work performed or placed" for purposes of progress payments.

■ Paragraph 2–02, quoted above, authorized "excavation * * * by any approved method." Under paragraph 2–06, concerning waste areas, plaintiff was left with the complete discretion to utilize whatever available waste areas it chose to dispose of excess fill, subject to the conditions that required waste areas were to be completely filled and the contracting officer could designate the waste areas for the disposal of certain materials, as provided in paragraph 2–03.

Pursuant to the contract, plaintiff prepared a diagram showing proposed haul routes, approximate balance lines, and possible stream crossings. It is not contended that the contracting officer or his representatives dictated the terms of this layout. There is no dispute that plaintiff in fact performed the labor necessary to do the balancing. Moreover, it was at plaintiff's request that additional waste areas at the eastern end of the job were provided for the disposal of excess excavated materials. These actions indicate an understanding of the contract in direct conflict with plaintiff's present interpretation. "It is a canon of construction that the interpretation placed by the parties upon a contract during its performance is demonstrative of their intention. Universal Match Corp. v. United States,

161 Ct.Cl. 418 (1963)." Jansen v. United States, 344 F.2d 363, 369, 170 Ct.Cl. 346, 354–355 (1965).

■ From the contract language and these actions, and in the absence of a showing that the Government actually had a duty to *direct*, or directed, the placement of the excavated materials, we conclude that plaintiff's contention must fail. It is unreasonable to suppose that the Government would hire an experienced contractor to provide nothing more than the labor involved to complete so large a project. As this court has stated,

> * * * [i]n engaging the services of professional * * * builders through the bid process the Government acquires a reservoir of developed skills as an important part of the consideration, for as in every industry or profession a background of extensive experience is an indispensable asset in coping with contingencies. * * * [4]

The Board did not err in determining that the Government did not have the contractual obligation to balance the excavation and fill.

### III.

Plaintiff contends that the Board's decision is arbitrary, capricious, grossly erroneous, and unsupported by the evidence because the Board failed to resolve the issues of whether a joint Government-contractor survey of Required Waste Area No. 34 was taken and whether the consensus at the meeting was that area No. 34 would require 20,000 cubic yards. Of course, underlying this contention is the assumption by plaintiff that a resolution of these matters in its favor would change the disposition of this case, apparently on the ground of negligent misrepresentation. See Morrison-Knudsen Co. v. United States, 345 F.2d 535, 170 Ct.Cl. 712 (1965). This assumption is erroneous.

---

4. Norfolk Dredging Co. v. United States, 360 F.2d 619, 626, 175 Ct.Cl. 594, 607, cert. denied, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966).

If we assume arguendo that the disputed joint survey of area No. 34 was taken, plaintiff must argue that it justifiably relied upon, and was misled by, the results of that survey to its detriment. As we have decided above, there was no contractual obligation upon the Government to survey waste areas. Thus, plaintiff must rely upon the Government's voluntary participation in the survey. Since the survey was *jointly* made, any errors resulting therefrom were the joint responsibility of the parties. It is absurd for plaintiff to claim that it was misled only by the Government's participation in the survey, when plaintiff itself contributed equally to any miscalculation and in fact, therefore, relied equally upon its own actions. Plaintiff does not contend that the Government sought plaintiff's assistance in making the survey, or that any representative of the Government, authorized or unauthorized, represented that the survey was correct, directed the survey, or directed plaintiff to rely upon the results thereof. Thus, even if the survey was taken, plaintiff is in no better position.

The conclusion reached at the meeting held in June 1960 cannot, for similar reasons, assist plaintiff. If, as alleged, the consensus was that Required Waste Area No. 34 would necessitate 20,000 cubic yards of fill, plaintiff's participation in reaching that result was equal to the Government's.

■ The Government was not possessed of any pertinent information not available to the plaintiff, and none, so far as can be determined, that indicated the surprising capacity of area No. 34. Again, plaintiff does not contend that its representatives were in any way directed or urged to rely upon the alleged consensus.[5] In the absence, therefore, of a showing of at least more than equal Government participation in reaching the conclusion, plaintiff cannot reasonably claim that he was misled by defendant's mere acquiescence. As this court has held, a prerequisite to recovery on the ground of negligent misrepresentation is a showing that plaintiff was actually misled by such misrepresentations.[6] For these reasons, the Board's failure to resolve these factual issues does not require our reversal.

## IV.

■ Plaintiff contends that the Board's decision was arbitrary, capricious, grossly erroneous, and unsupported by the evidence, in that the Board made an "effective finding" that the unexpected requirements of Required Waste Area No. 34 were caused by changed conditions, as that term is contemplated by the contract, and yet failed to find for the plaintiff. It is well settled that an issue not raised before the Board cannot be raised for the first time before this court. Beaconwear Clothing Co. v. United States, 355 F.2d 583, 174 Ct.Cl. 40 (1966); see Norfolk Dredging Co. v. United States, 360 F.2d 619, 175 Ct.Cl. 594, cert. denied, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966). In neither plaintiff's complaint nor briefs filed before the Board has the possibility of changed conditions been suggested. Consequently, this issue would normally be deemed waived. Plaintiff, however, points to the following language from the Board's opinion:

\* \* \* An explanation of the cause of this [shortage] was given by a witness for appellant who was of the opinion that Required Waste Area No. 34's location in an old river bed resulted in its requiring the application of a greater shrinkage factor than the standard 20% factor used throughout the job for planning purposes by

---

5. Neither the contracting officer nor his representative was even present. Cf. F. H. McGraw & Co. v. United States, 82 F.Supp. 338, 113 Ct.Cl. 29 (1949).

6. L. M. Jones Co. v. United States, 178 Ct.Cl. 636 (1967); Morrison-Knudsen Co. v. United States, 345 F.2d 535, 170 Ct.Cl. 712 (1965).

both Government and contractor personnel. * * * [7]

Plaintiff's position, therefore, must be that the quoted statement was a finding of fact which preserves the issue for our consideration.

■ But even assuming arguendo that the issue of changed conditions has been properly raised and that, upon return of the case to the Board, plaintiff could prove that the unexpected nature of Required Waste Area No. 34 was the result of subsurface, latent, or unusual conditions, plaintiff still cannot prevail. It is undisputed that there was no shortage of fill if the overall project is considered. It is also unequivocally clear, from both the original contract and the modification concerning Available Waste Area No. 59, that plaintiff had an obligation to fill to specification all required waste areas.

Clause 4 of Standard Form 23A, incorporated as part of the contract between plaintiff Ace and the Government, provides that the contracting officer, upon notification of subsurface, latent, or unusual physical conditions,

* * * shall promptly investigate the conditions, and if he finds that such conditions do * * * materially differ [from the contract specifications or from those ordinarily encountered and generally recognized as inhering in the type of work contracted for] *and cause* an increase * * * in the cost of * * * performance of this contract, an equitable adjustment shall be made * * *. [Emphasis supplied.]

As the above language indicates, an equitable adjustment will not be made unless the physical conditions in question are not only materially different, but are also the cause of the increased costs of performance. Plaintiff Ace itself chose to fill available waste areas at the eastern end of the site without first filling required waste areas at the western end. It is not contended that the nature or cost of the entire job would have been changed because of delaying the excavation while the required waste areas at the western end of the site were cleared, or because of unexpected labor or hauling costs had plaintiff originally moved material from the eastern to the western end of the site. Since, as we have decided, plaintiff bore the burden of balancing excavation and fill, it cannot complain that an unexpected and localized condition was the cause of increased performance costs, when such costs could have been obviated by plaintiff's proper performance of its excavation-fill obligation. In this case, plaintiff's own actions were the primary cause of its loss, not the unexpected nature of Required Waste Area No. 34. Therefore, plaintiff is not entitled to an equitable adjustment because of changed conditions.[8]

Plaintiff belatedly argues that the Government "effectively changed" the contract when it influenced the determination at the meeting of June 1960 that 20,000 cubic yards were needed for area No. 34 and when the Government refused to assist the plaintiff in acquiring additional fill, indicating its expectation that plaintiff would complete the job according to specifications. Plaintiff did not raise these matters before the Board. Although, for reasons similar to those set forth in this opinion, we believe that no change was effect-

7. Ace Constr. Co., 66–1 BCA ¶ 5545, at 25,936 (ENG BCA 1966).

8. Using analogous reasoning, this court has denied recovery under the Changed Conditions clause because of the contractor's actions or inaction in failing to inspect or in failing to anticipate reasonably foreseeable difficulties in performance. See, e. g., Amino Bros. Co. v. United States, 372 F.2d 485, 178 Ct.Cl. 515, cert. denied, 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967); Norfolk Dredging Co. v. United States, 360 F.2d 619, 175 Ct.Cl. 594, cert. denied, 385 U.S. 919, 87 S.Ct. 229, 17 L.Ed.2d 143 (1966); Jefferson Constr. Co. v. United States, 348 F.2d 968, 172 Ct.Cl. 560 (1965); cf. Perini Corp. v. United States, 381 F.2d 403, 180 Ct.Cl. 768 (1967).

uated, we need not consider this point since, under established principles, the issue has been waived.[9]

For the reasons set forth herein, the Board did not err as alleged by plaintiff, and we uphold its decision. Accordingly, plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted, and the petition is dismissed.

9. See Norfolk Dredging Co. v. United States, 360 F.2d 619, 175 Ct.Cl. 594, cert. denied, 385 U.S. 919, 87 S.Ct. 229, 17

L.Ed.2d 143 (1966); Beaconwear Clothing Co. v. United States, 355 F.2d 583, 174 Ct.Cl. 40 (1966).